# CITY OF MOBILE, ALABAMA, ET AL. v. BOLDEN ET AL.

No. 77–1844.  Argued March 19, 1979—Reargued October 29, 1979—
Decided April 22, 1980

STEWART, J., announced the Court's judgment and delivered an opinion, in which BURGER, C. J., and POWELL and REHNQUIST, JJ., joined. BLACKMUN, J., filed an opinion concurring in the result, *post*, p. 80. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 83. BRENNAN, J., *post*, p. 94, WHITE, J., *post*, p. 94, and MARSHALL, J., *post*, p. 103, filed dissenting opinions.

*Charles S. Rhyne* reargued the cause for appellants. With him on the brief on reargument were *C. B. Arendall, Jr., William C. Tidwell III, Fred G. Collins,* and *William S. Rhyne.* With him on the briefs on the original argument were Messrs. Arendall, Collins, and Rhyne, *Donald A. Carr,* and *Martin W. Matzen.*

*J. U. Blacksher* reargued the cause for appellees. With him on the briefs were *Larry Menefee, Jack Greenberg,* and *Eric Schnapper.*

*Deputy Assistant Attorney General Turner* reargued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Solicitor General McCree, Assistant Attorney General Days, Deputy Solicitor General Wallace, Elinor Hadley Stillman, Brian K. Landsberg, Jessica Dunsay Silver, Dennis J. Dimsey,* and *Miriam R. Eisenstein.**

*Charles A. Bane, Thomas D. Barr, Norman Redlich, Frank R. Parker,* and *Robert A. Murphy* filed a brief for the Lawyers' Committee for Civil Rights Under Law as *amicus curiae* urging affirmance.

MR. JUSTICE STEWART announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, MR. JUSTICE POWELL, and MR. JUSTICE REHNQUIST joined.

The city of Mobile, Ala., has since 1911 been governed by a City Commission consisting of three members elected by the voters of the city at large. The question in this case is whether this at-large system of municipal elections violates the rights of Mobile's Negro voters in contravention of federal statutory or constitutional law.

The appellees brought this suit in the Federal District Court for the Southern District of Alabama as a class action on behalf of all Negro citizens of Mobile.[1] Named as defendants were the city and its three incumbent Commissioners, who are the appellants before this Court. The complaint alleged that the practice of electing the City Commissioners at large unfairly diluted the voting strength of Negroes in violation of § 2 of the Voting Rights Act of 1965,[2] of the Fourteenth Amendment, and of the Fifteenth Amendment. Following a bench trial, the District Court found that the constitutional rights of the appellees had been violated, entered a judgment in their favor, and ordered that the City Commission be disestablished and replaced by a municipal government consisting of a Mayor and a City Council with members elected from single-member districts. 423 F. Supp. 384.[3] The Court of Appeals affirmed the judgment in its entirety, 571 F. 2d 238, agreeing that Mobile's at-large elections operated to discriminate against Negroes in violation of the Fourteenth and Fifteenth Amendments, id., at 245, and finding that the remedy formulated by the District Court was

---

[1] Approximately 35.4% of the residents of Mobile are Negro.

[2] 79 Stat. 437, as amended, 42 U. S. C. § 1973. The complaint also contained claims based on the First and Thirteenth Amendments and on 42 U. S. C. § 1983 and 42 U. S. C. § 1985 (3) (1976 ed., Supp. II). Those claims have not been pressed in this Court.

[3] The District Court has stayed its orders pending disposition of the present appeal.

appropriate. An appeal was taken to this Court, and we noted probable jurisdiction, 439 U. S. 815. The case was originally argued in the 1978 Term, and was reargued in the present Term.

I

In Alabama, the form of municipal government a city may adopt is governed by state law. Until 1911, cities not covered by specific legislation were limited to governing themselves through a mayor and city council.[4] In that year, the Alabama Legislature authorized every large municipality to adopt a commission form of government.[5] Mobile established its City Commission in the same year, and has maintained that basic system of municipal government ever since.

The three Commissioners jointly exercise all legislative, executive, and administrative power in the municipality. They are required after election to designate one of their number as Mayor, a largely ceremonial office, but no formal provision is made for allocating specific executive or administrative duties among the three.[6] As required by the state law enacted in 1911, each candidate for the Mobile City Commission runs for election in the city at large for a term of four years in one of three numbered posts, and may be elected

---

[4] Ala. Code § 11–43 (1975).

[5] Act No. 281, 1911 Ala. Acts, p. 330.

[6] In 1965 the Alabama Legislature enacted Act No. 823, 1965 Ala. Acts, p. 1539, § 2 of which designated specific administrative tasks to be performed by each Commissioner and provided that the title of Mayor be rotated among the three. After the present lawsuit was commenced, the city of Mobile belatedly submitted Act No. 823 to the Attorney General of the United States under § 5 of the Voting Rights Act of 1965. 42 U. S. C. § 1973c. The Attorney General objected to the legislation on the ground that the city had not shown that § 2 of the Act would not have the effect of abridging the right of Negroes to vote. No suit has been brought in the District Court for the District of Columbia to seek clearance under § 5 of the Voting Rights Act and, accordingly, § 2 of Act No. 823 is in abeyance.

only by a majority of the total vote. This is the same basic electoral system that is followed by literally thousands of municipalities and other local governmental units throughout the Nation.[7]

## II

Although required by general principles of judicial administration to do so, *Spector Motor Service, Inc.* v. *McLaughlin*, 323 U. S. 101, 105; *Ashwander* v. *TVA*, 297 U. S. 288, 347 (Brandeis, J., concurring), neither the District Court nor the Court of Appeals addressed the complaint's statutory claim—that the Mobile electoral system violates § 2 of the Voting Rights Act of 1965. Even a cursory examination of that claim, however, clearly discloses that it adds nothing to the appellees' complaint.

Section 2 of the Voting Rights Act provides:

> "No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color." 79 Stat. 437, as amended, 42 U. S. C. § 1973.

Assuming, for present purposes, that there exists a private right of action to enforce this statutory provision,[8] it is apparent that the language of § 2 no more than elaborates upon that of the Fifteenth Amendment,[9] and the sparse legislative his-

---

[7] According to the 1979 Municipal Year Book, most municipalities of over 25,000 people conducted at-large elections of their city commissioners or council members as of 1977. *Id.*, at 98–99. It is reasonable to suppose that an even larger majority of other municipalities did so.

[8] Cf. *Allen* v. *State Board of Elections*, 393 U. S. 544. But see *Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U. S. 11; *Touche Ross & Co.* v. *Redington*, 442 U. S. 560.

[9] Section 1 of the Fifteenth Amendment provides:
"The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

tory of § 2 makes clear that it was intended to have an effect no different from that of the Fifteenth Amendment itself.

Section 2 was an uncontroversial provision in proposed legislation whose other provisions engendered protracted dispute. The House Report on the bill simply recited that § 2 "grants . . . a right to be free from enactment or enforcement of voting qualifications . . . or practices which deny or abridge the right to vote on account of race or color." H. R. Rep. No. 439, 89th Cong., 1st Sess., 23 (1965). See also S. Rep. No. 162, 89th Cong., 1st Sess., pt. 3, pp. 19–20 (1965). The view that this section simply restated the prohibitions already contained in the Fifteenth Amendment was expressed without contradiction during the Senate hearings. Senator Dirksen indicated at one point that all States, whether or not covered by the preclearance provisions of § 5 of the proposed legislation, were prohibited from discriminating against Negro voters by § 2, which he termed "almost a rephrasing of the 15th [A]mendment." Attorney General Katzenbach agreed. See Voting Rights: Hearings on S. 1564 before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., pt. 1, p. 208 (1965).

In view of the section's language and its sparse but clear legislative history, it is evident that this statutory provision adds nothing to the appellees' Fifteenth Amendment claim. We turn, therefore, to a consideration of the validity of the judgment of the Court of Appeals with respect to the Fifteenth Amendment.

### III

The Court's early decisions under the Fifteenth Amendment established that it imposes but one limitation on the powers of the States. It forbids them to discriminate against Negroes in matters having to do with voting. See *Ex parte Yarbrough*, 110 U. S. 651, 665; *Neal* v. *Delaware*, 103 U. S. 370, 389–390; *United States* v. *Cruikshank*, 92 U. S. 542, 555–556; *United States* v. *Reese*, 92 U. S. 214. The Amend-

ment's command and effect are wholly negative. "The Fifteenth Amendment does not confer the right of suffrage upon any one," but has "invested the citizens of the United States with a new constitutional right which is within the protecting power of Congress. That right is exemption from discrimination in the exercise of the elective franchise on account of race, color, or previous condition of servitude." *Id.*, at 217–218.

Our decisions, moreover, have made clear that action by a State that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose. In *Guinn* v. *United States*, 238 U. S. 347, this Court struck down a "grandfather" clause in a state constitution exempting from the requirement that voters be literate any person or the descendants of any person who had been entitled to vote before January 1, 1866. It was asserted by way of defense that the provision was immune from successful challenge, since a law could not be found unconstitutional either "by attributing to the legislative authority an occult motive," or "because of conclusions concerning its operation in practical execution and resulting discrimination arising . . . from inequalities naturally inhering in those who must come within the standard in order to enjoy the right to vote." *Id.*, at 359. Despite this argument, the Court did not hesitate to hold the grandfather clause unconstitutional, because it was not "possible to discover any basis in reason for the standard thus fixed other than the purpose" to circumvent the Fifteenth Amendment. *Id.*, at 365.

The Court's more recent decisions confirm the principle that racially discriminatory motivation is a necessary ingredient of a Fifteenth Amendment violation. In *Gomillion* v. *Lightfoot,* 364 U. S. 339, the Court held that allegations of a racially motivated gerrymander of municipal boundaries stated a claim under the Fifteenth Amendment. The constitutional infirmity of the state law in that case, according to the allegations of the complaint, was that in drawing the

municipal boundaries the legislature was "solely concerned with segregating white and colored voters by fencing Negro citizens out of town so as to deprive them of their pre-existing municipal vote." *Id.*, at 341. The Court made clear that in the absence of such an invidious purpose, a State is constitutionally free to redraw political boundaries in any manner it chooses. *Id.*, at 347.[10]

In *Wright* v. *Rockefeller*, 376 U. S. 52, the Court upheld by like reasoning a state congressional reapportionment statute against claims that district lines had been racially gerrymandered, because the plaintiffs failed to prove that the legislature "was either motivated by racial considerations or in fact drew the districts on racial lines"; or that the statute "was the product of a state contrivance to segregate on the basis of race or place of origin." *Id.*, at 56, 58.[11] See also *Lassiter* v. *Northampton Election Bd.*, 360 U. S. 45; *Lane* v. *Wilson*, 307 U. S. 268, 275–277.

While other of the Court's Fifteenth Amendment decisions have dealt with different issues, none has questioned the necessity of showing purposeful discrimination in order to show a Fifteenth Amendment violation. The cases of *Smith* v. *Allwright*, 321 U. S. 649, and *Terry* v. *Adams*, 345 U. S. 461, for

---

[10] The Court has repeatedly cited *Gomillion* v. *Lightfoot* for the principle that an invidious *purpose* must be adduced to support a claim of unconstitutionality. See *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256, 272; *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 265, 266; *Washington* v. *Davis*, 426 U. S. 229, 240.

[11] Mr. Justice Marshall has elsewhere described the fair import of the *Gomillion* and *Wright* cases: "In the two Fifteenth Amendment redistricting cases, *Wright* v. *Rockefeller*, 376 U. S. 52 (1964), and *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960), the Court suggested that legislative purpose alone is determinative, although language in both cases may be isolated that seems to approve some inquiry into effect insofar as it elucidates purpose." *Beer* v. *United States*, 425 U. S. 130, 148, n. 4 (dissenting opinion).

The Court in the *Wright* case also rejected claims made under the Equal Protection Clause of the Fourteenth Amendment. See *infra*, at 67.

example, dealt with the question whether a State was so involved with racially discriminatory voting practices as to invoke the Amendment's protection. Although their facts differed somewhat, the question in both cases was whether the State was sufficiently implicated in the conduct of racially exclusionary primary elections to make that discrimination an abridgment of the right to vote *by a State.* Since the Texas Democratic Party primary in *Smith* v. *Allwright* was regulated by statute, and only party nominees chosen in a primary were placed on the ballot for the general election, the Court concluded that the state Democratic Party had become the agency of ·the State, and that the State thereby had "endorse[d], adopt[ed] and enforce[d] the discrimination against Negroes, practiced by a party." 321 U. S., at 664.

*Terry* v. *Adams, supra,* posed a more difficult question of state involvement. The primary election challenged in that case was conducted by a county political organization, the Jaybird Association, that was neither authorized nor regulated under state law. The candidates chosen in the Jaybird primary, however, invariably won in the subsequent Democratic primary and in the general election, and the Court found that the Fifteenth Amendment had been violated. Although the several supporting opinions differed in their formulation of this conclusion, there was agreement that the State was involved in the purposeful exclusion of Negroes from participation in the election process.

The appellees have argued in this Court that *Smith* v. *Allwright* and *Terry* v. *Adams* support the conclusion that the at-large system of elections in Mobile is unconstitutional, reasoning that the effect of racially polarized voting in Mobile is the same as that of a racially exclusionary primary. The only characteristic, however, of the exclusionary primaries that offended the Fifteenth Amendment was that Negroes were not permitted to vote in them. The difficult question was whether the "State ha[d] had a hand in" the patent dis-

crimination practiced by a nominally private organization. *Terry* v. *Adams, supra,* at 473 (opinion of Frankfurter, J.).

The answer to the appellees' argument is that, as the District Court expressly found, their freedom to vote has not been denied or abridged by anyone. The Fifteenth Amendment does not entail the right to have Negro candidates elected, and neither *Smith* v. *Allwright* nor *Terry* v. *Adams* contains any implication to the contrary. That Amendment prohibits only purposefully discriminatory denial or abridgment by government of the freedom to vote "on account of race, color, or previous condition of servitude." Having found that Negroes in Mobile "register and vote without hindrance," the District Court and Court of Appeals were in error in believing that the appellants invaded the protection of that Amendment in the present case.

## IV

The Court of Appeals also agreed with the District Court that Mobile's at-large electoral system violates the Equal Protection Clause of the Fourteenth Amendment. There remains for consideration, therefore, the validity of its judgment on that score.

## A

The claim that at-large electoral schemes unconstitutionally deny to some persons the equal protection of the laws has been advanced in numerous cases before this Court. That contention has been raised most often with regard to multimember constituencies within a state legislative apportionment system. The constitutional objection to multimember districts is not and cannot be that, as such, they depart from apportionment on a population basis in violation of *Reynolds* v. *Sims,* 377 U. S. 533, and its progeny. Rather the focus in such cases has been on the lack of representation multimember districts afford various elements of the voting population in a system of representative legislative democracy. "Criticism [of multimember districts] is rooted in their winner-

take-all aspects, their tendency to submerge minorities . . . , a general preference for legislatures reflecting community interests as closely as possible and disenchantment with political parties and elections as devices to settle policy differences between contending interests." *Whitcomb* v. *Chavis,* 403 U. S. 124, 158–159.

Despite repeated constitutional attacks upon multimember legislative districts, the Court has consistently held that they are not unconstitutional *per se, e. g., White* v. *Regester,* 412 U. S. 755; *Whitcomb* v. *Chavis, supra; Kilgarlin* v. *Hill,* 386 U. S. 120; *Burns* v. *Richardson,* 384 U. S. 73; *Fortson* v. *Dorsey,* 379 U. S. 433.[12] We have recognized, however, that such legislative apportionments could violate the Fourteenth Amendment if their purpose were invidiously to minimize or cancel out the voting potential of racial or ethnic minorities. See *White* v. *Regester, supra; Whitcomb* v. *Chavis, supra; Burns* v. *Richardson, supra; Fortson* v. *Dorsey, supra.* To prove such a purpose it is not enough to show that the group allegedly discriminated against has not elected representatives in proportion to its numbers. *White* v. *Regester, supra,* at 765–766; *Whitcomb* v. *Chavis,* 403 U. S., at 149–150. A plaintiff must prove that the disputed plan was "conceived or operated as [a] purposeful devic[e] to further racial . . . discrimination," *id.,* at 149.

This burden of proof is simply one aspect of the basic principle that only if there is purposeful discrimination can there be a violation of the Equal Protection Clause of the Fourteenth Amendment. See *Washington* v. *Davis,* 426 U. S. 229;

---

[12] We have made clear, however, that a court in formulating an apportionment plan as an exercise of its equity powers should, as a general rule, not permit multimember legislative districts. "[S]ingle-member districts are to be preferred in court-ordered legislative reapportionment plans unless the court can articulate a 'singular combination of unique factors' that justifies a different result. *Mahan* v. *Howell,* 410 U. S. 315, 333." *Connor* v. *Finch,* 431 U. S. 407, 415.

*Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252; *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256. The Court explicitly indicated in *Washington* v. *Davis* that this principle applies to claims of racial discrimination affecting voting just as it does to other claims of racial discrimination. Indeed, the Court's opinion in that case viewed *Wright* v. *Rockefeller*, 376 U. S. 52, as an apt illustration of the principle that an illicit purpose must be proved before a constitutional violation can be found. The Court said:

> "The rule is the same in other contexts. *Wright* v. *Rockefeller*, 376 U. S. 52 (1964), upheld a New York congressional apportionment statute against claims that district lines had been racially gerrymandered. The challenged districts were made up predominantly of whites or of minority races, and their boundaries were irregularly drawn. The challengers did not prevail because they failed to prove that the New York Legislature 'was either motivated by racial considerations or in fact drew the districts on racial lines'; the plaintiffs had not shown that the statute 'was the product of a state contrivance to segregate on the basis of race or place of origin.' *Id.*, at 56, 58. The dissenters were in agreement that the issue was whether the 'boundaries . . . were purposefully drawn on racial lines.' *Id.*, at 67." *Washington* v. *Davis, supra,* at 240.

More recently, in *Arlington Heights* v. *Metropolitan Housing Dev. Corp., supra,* the Court again relied on *Wright* v. *Rockefeller* to illustrate the principle that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." 429 U. S., at 265. Although dicta may be drawn from a few of the Court's earlier opinions suggesting that disproportionate effects alone may establish a claim of unconstitutional racial vote dilution, the fact is that such a view is not supported by any decision of

this Court.[13]  More importantly, such a view is not consistent with the meaning of the Equal Protection Clause as it has been understood in a variety of other contexts involving alleged racial discrimination.  *Washington* v. *Davis, supra* (employment); *Arlington Heights* v. *Metropolitan Housing Dev. Corp., supra* (zoning); *Keyes* v. *School District No. 1, Denver, Colo.,* 413 U. S. 189, 208 (public schools); *Akins* v. *Texas,* 325 U. S. 398, 403–404 (jury selection).

In only one case has the Court sustained a claim that multimember legislative districts unconstitutionally diluted the voting strength of a discrete group.  That case was *White* v. *Regester.*  There the Court upheld a constitutional challenge by Negroes and Mexican-Americans to parts of a legislative reapportionment plan adopted by the State of Texas.  The plaintiffs alleged that the multimember districts for the two counties in which they resided minimized the effect of their votes in violation of the Fourteenth Amendment, and the Court held that the plaintiffs had been able to "produce evidence to support findings that the political processes lead-

---

[13] The dissenting opinion of MR. JUSTICE MARSHALL reads the Court's opinion in *Fortson* v. *Dorsey,* 379 U. S. 433, to say that a claim of vote dilution under the Equal Protection Clause could rest on either discriminatory purpose or effect.  *Post,* at 108.  In fact, the Court explicitly reserved this question and expressed no view concerning it.  That case involved solely a claim, which the Court rejected, that a state legislative apportionment statute creating some multimember districts was constitutionally infirm on its face.  Although the Court recognized that "designedly or otherwise," multimember districting schemes might, under the circumstances of a particular case, minimize the voting strength of a racial group, an issue as to the constitutionality of such an arrangement "[was] not presented by the record," and " 'our holding ha[d] no bearing on that wholly separate question.' "  379 U. S., at 439.

The phrase "designedly or otherwise" in which this dissenting opinion places so much stock, was repeated, also in dictum, in *Burns* v. *Richardson,* 384 U. S. 73, 88.  But the constitutional challenge to the multimember constituencies failed in that case because the plaintiffs demonstrated neither discriminatory purpose nor effect.  *Id.,* at 88–90, and nn. 15 and 16.

ing to nomination and election were not equally open to participation by the group[s] in question." 412 U. S., at 766, 767. In so holding, the Court relied upon evidence in the record that included a long history of official discrimination against minorities as well as indifference to their needs and interests on the part of white elected officials. The Court also found in each county additional factors that restricted the access of minority groups to the political process. In one county, Negroes effectively were excluded from the process of slating candidates for the Democratic Party, while the plaintiffs in the other county were Mexican-Americans who "suffer[ed] a cultural and language barrier" that made "participation in community processes extremely difficult, particularly . . . with respect to the political life" of the county. *Id.*, at 768 (footnote omitted).

*White* v. *Regester* is thus consistent with "the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose," *Washington* v. *Davis*, 426 U. S., at 240. The Court stated the constitutional question in *White* to be whether the "multimember districts [were] *being used invidiously* to cancel out or minimize the voting strength of racial groups," 412 U. S., at 765 (emphasis added), strongly indicating that only a purposeful dilution of the plaintiffs' vote would offend the Equal Protection Clause.[14]

---

[14] In *Gaffney* v. *Cummings*, 412 U. S. 735, a case decided the same day as *White* v. *Regester*, the Court interpreted both *White* and the earlier vote dilution cases as turning on the existence of discriminatory purpose:

"State legislative districts may be equal or substantially equal in population and still be vulnerable under the Fourteenth Amendment. A districting statute otherwise acceptable, may be invalid because it fences out a racial group so as to deprive them of their pre-existing municipal vote. *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960). A districting plan may create multimember districts perfectly acceptable under equal population standards, but invidiously discriminatory because they are *employed* 'to minimize or cancel out the voting strength of racial or political elements of

Moreover, much of the evidence on which the Court relied in that case was relevant only for the reason that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S., at 264–265. Of course, "[t]he impact of the official action—whether it 'bears more heavily on one race than another,' *Washington* v. *Davis, supra,* at 242—may provide an important starting point." *Arlington Heights* v. *Metropolitan Housing Dev. Corp., supra,* at 266. But where the character of a law is readily explainable on grounds apart from race, as would nearly always be true where, as here, an entire system of local governance is brought into question, disproportionate impact âlone cannot be decisive, and courts must look to other evidence to support a finding of discriminatory purpose. See *ibid.; Washington* v. *Davis, supra,* at 242.

We may assume, for present purposes, that an at-large election of city officials with all the legislative, executive, and administrative power of the municipal government is constitutionally indistinguishable from the election of a few members of a state legislative body in multimember districts—although this may be a rash assumption.[15] But even making this assumption, it is clear that the evidence in the present case fell far short of showing that the appellants "conceived or operated [a]' purposeful devic[e] to further racial . . . discrimination." *Whitcomb* v. *Chavis,* 403 U. S., at 149.

the voting population.' *Fortson* v. *Dorsey,* 379 U. S. 433, 439 (1965). See *White* v. *Regester, post,* p. 755; *Whitcomb* v. *Chavis,* 403 U. S. 124 (1971); *Abate* v. *Mundt,* 403 U. S., at 184, n. 2; *Burns* v. *Richardson,* 384 U. S., at 88–89." 412 U. S., at 751 (emphasis added).

[15] See *Wise* v. *Lipscomb,* 437 U. S. 535, 550 (opinion of REHNQUIST, J.). It is noteworthy that a system of at-large city elections in place of elections of city officials by the voters of small geographic wards was universally heralded not many years ago as a praiseworthy and progressive reform of corrupt municipal government. See, *e. g.,* E. Banfield & J. Wilson, City Politics 151 (1963). Cf. M. Seasongood, Local Government in the United States (1933); L. Steffens, The Shame of the Cities (1904).

The District Court assessed the appellees' claims in light of the standard that had been articulated by the Court of Appeals for the Fifth Circuit in *Zimmer* v. *McKeithen,* 485 F. 2d 1297. That case, coming before *Washington* v. *Davis,* 426 U. S. 229, was quite evidently decided upon the misunderstanding that it is not necessary to show a discriminatory purpose in order to prove a violation of the Equal Protection Clause—that proof of a discriminatory effect is sufficient. See 485 F. 2d, at 1304–1305, and n. 16.[16]

In light of the criteria identified in *Zimmer,* the District Court based its conclusion of unconstitutionality primarily on the fact that no Negro had ever been elected to the City Commission, apparently because of the pervasiveness of racially polarized voting in Mobile. The trial court also found that city officials had not been as responsive to the interests of Negroes as to those of white persons. On the basis of these findings, the court concluded that the political processes in Mobile were not equally open to Negroes, despite its seemingly inconsistent findings that there were no inhibitions against Negroes becoming candidates, and that in fact Negroes had registered and voted without hindrance. 423 F. Supp., at 387. Finally, with little additional discussion, the District Court held that Mobile's at-large electoral system was invidiously discriminating against Negroes in violation of the Equal Protection Clause.[17]

---

[16] This Court affirmed the judgment of the Court of Appeals in *Zimmer* v. *McKeithen* on grounds other than those relied on by that court and explicitly "without approval of the constitutional views expressed by the Court of Appeals." *East Carroll Parish School Bd.* v. *Marshall,* 424 U. S. 636, 638 *(per curiam).*

[17] The only indication given by the District Court of an inference that there existed an invidious purpose was the following statement: "It is not a long step from the *systematic exclusion of blacks* from juries which is itself such an 'unequal application of the law . . . as to show intentional discrimination,' *Akins* v. *Texas,* 325 U. S. 398, 404, . . . to [the] present purpose to dilute the black vote as evidenced in this case. There

In affirming the District Court, the Court of Appeals acknowledged that the Equal Protection Clause of the Fourteenth Amendment reaches only purposeful discrimination,[18] but held that one way a plaintiff may establish this illicit purpose is by adducing evidence that satisfies the criteria of its decision in *Zimmer* v. *McKeithen, supra*. Thus, because the appellees had proved an "aggregate" of the *Zimmer* factors, the Court of Appeals concluded that a discriminatory purpose

is a 'current' condition of dilution of the black vote resulting from intentional state legislative *inaction* which is as effective as the intentional state action referred to in *Keyes* [v. *School District No. 1, Denver Colo.,* 413 U. S. 189]." 423 F. Supp., at 398.

What the District Court may have meant by this statement is uncertain. In any event the analogy to the racially exclusionary jury cases appears mistaken. Those cases typically have involved a consistent pattern of discrete official actions that demonstrated almost to a mathematical certainty that Negroes were being excluded from juries because of their race. See *Castaneda* v. *Partida,* 430 U. S. 482, 495–497, and n. 17; *Patton* v. *Mississippi,* 332 U. S. 463, 466–467; *Pierre* v. *Louisiana,* 306 U. S. 354, 359; *Norris* v. *Alabama,* 294 U. S. 587, 591.

If the District Court meant by its statement that the existence of the at-large electoral system was, like the systematic exclusion of Negroes from juries, unexplainable on grounds other than race, its inference is contradicted by the history of the adoption of that system in Mobile. Alternatively, if the District Court meant that the state legislature may be presumed to have "intended" that there would be no Negro Commissioners, simply because that was a foreseeable consequence of at-large voting, it applied an incorrect legal standard. " 'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. . . . It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S., at 279 (footnotes omitted).

[18] The Court of Appeals expressed the view that the District Court's finding of discrimination in light of the *Zimmer* criteria was "buttressed" by the fact that the Attorney General had interposed an objection under § 5 of the Voting Rights Act of 1965 to the state statute designating the functions of each Commissioner. 571 F. 2d 238, 246 (CA5). See n. 6, *supra*.

had been proved. That approach, however, is inconsistent with our decisions in *Washington* v. *Davis, supra,* and *Arlington Heights, supra.* Although the presence of the indicia relied on in *Zimmer* may afford some evidence of a discriminatory purpose, satisfaction of those criteria is not of itself sufficient proof of such a purpose. The so-called *Zimmer* criteria upon which the District Court and the Court of Appeals relied were most assuredly insufficient to prove an unconstitutionally discriminatory purpose in the present case.

First, the two courts found it highly significant that no Negro had been elected to the Mobile City Commission. From this fact they concluded that the processes leading to nomination and election were not open equally to Negroes. But the District Court's findings of fact, unquestioned on appeal, make clear that Negroes register and vote in Mobile "without hindrance," and that there are no official obstacles in the way of Negroes who wish to become candidates for election to the Commission. Indeed, it was undisputed that the only active "slating" organization in the city is comprised of Negroes. It may be that Negro candidates have been defeated, but that fact alone does not work a constitutional deprivation. *Whitcomb* v. *Chavis,* 403 U. S., at 160; see *Arlington Heights,* 429 U. S., at 266, and n. 15.[19]

Second, the District Court relied in part on its finding that the persons who were elected to the Commission discriminated against Negroes in municipal employment and in dispensing public services. If that is the case, those discriminated against may be entitled to relief under the Constitution, albeit of a sort quite different from that sought in the present case. The Equal Protection Clause proscribes purposeful discrimination because of race by any unit of state government, what-

---

[19] There have been only three Negro candidates for the City Commission, all in 1973. According to the District Court, the Negro candidates "were young, inexperienced, and mounted extremely limited campaigns" and received only "modest support from the black community. . . ." 423 F. Supp., at 388.

ever the method of its election. But evidence of discrimination by white officials in Mobile is relevant only as the most tenuous and circumstantial evidence of the constitutional invalidity of the electoral system under which they attained their offices.[20]

Third, the District Court and the Court of Appeals supported their conclusion by drawing upon the substantial history of official racial discrimination in Alabama. But past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful. The ultimate question remains whether a discriminatory intent has been proved in a given case. More distant instances of official discrimination in other cases are of limited help in resolving that question.

Finally, the District Court and the Court of Appeals pointed to the mechanics of the at-large electoral system itself as proof that the votes of Negroes were being invidiously canceled out. But those features of that electoral system, such as the majority vote requirement, tend naturally to disadvantage any voting minority, as we noted in *White* v. *Regester,* 412 U. S. 755. They are far from proof that the at-large electoral scheme represents purposeful discrimination against Negro voters.[21]

---

[20] Among the difficulties with the District Court's view of the evidence was its failure to identify the state officials whose intent it considered relevant in assessing the invidiousness of Mobile's system of government. To the extent that the inquiry should properly focus on the state legislature, see n. 21, *infra,* the actions of unrelated governmental officials would be, of course, of questionable relevance.

[21] According to the District Court, voters in the city of Mobile are represented in the state legislature by three state senators, any one of whom can veto proposed local legislation under the existing courtesy rule. Likewise, a majority of Mobile's 11-member House delegation can prevent a local bill from reaching the floor for debate. Unanimous' approval of a local measure by the city delegation, on the other hand, virtually assures passage. 423 F. Supp., at 397.

There was evidence in this case that several proposals that would have

## B

We turn finally to the arguments advanced in Part I of MR. JUSTICE MARSHALL's dissenting opinion. The theory of this dissenting opinion—a theory much more extreme than that espoused by the District Court or the Court of Appeals— appears to be that every "political group," or at least every such group that is in the minority, has a federal constitutional right to elect candidates in proportion to its numbers.[22] Moreover, a political group's "right" to have its candidates elected is said to be a "fundamental interest," the infringement of which may be established without proof that a State has acted with the purpose of impairing anybody's access to the political process. This dissenting opinion finds the "right" infringed in the present case because no Negro has been elected to the Mobile City Commission.

Whatever appeal the dissenting opinion's view may have as a matter of political theory, it is not the law. The Equal Protection Clause of the Fourteenth Amendment does not

---

altered the form of Mobile's municipal government have been defeated in the state legislature, including at least one that would have permitted Mobile to govern itself through a Mayor and City Council with members elected from individual districts within the city. Whether it may be possible ultimately to prove that Mobile's present governmental and electoral system has been retained for a racially discriminatory purpose, we are in no position now to say.

[22] The dissenting opinion seeks to disclaim this description of its theory by suggesting that a claim of vote dilution may require, in addition to proof of electoral defeat, some evidence of "historical and social factors" indicating that the group in question is without political influence. *Post*, at 111–112, n. 7, 122–124. Putting to the side the evident fact that these gauzy sociological considerations have no constitutional basis, it remains far from certain that they could, in any principled manner, exclude the claims of any discrete political group that happens, for whatever reason, to elect fewer of its candidates than arithmetic indicates it might. Indeed, the putative limits are bound to prove illusory if the express purpose informing their application would be, as the dissent assumes, to redress the "inequitable distribution of political influence." *Post*, at 122.

.

require proportional representation as an imperative of political organization. The entitlement that the dissenting opinion assumes to exist simply is not to be found in the Constitution of the United States.

It is of course true that a law that impinges upon a fundamental right explicitly or implicitly secured by the Constitution is presumptively unconstitutional. See *Shapiro* v. *Thompson*, 394 U. S. 618, 634, 638; *id.*, at 642–644 (concurring opinion). See also *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 17, 30–32. But plainly "[i]t is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws," *id.*, at 33. See *Lindsey* v. *Normet*, 405 U. S. 56, 74; *Dandridge* v. *Williams*, 397 U. S. 471, 485. Accordingly, where a state law does not impair a right or liberty protected by the Constitution, there is no occasion to depart from "the settled mode of constitutional analysis of legislat[ion] . . . involving questions of economic and social policy," *San Antonio Independent School Dist.* v. *Rodriguez, supra,* at 33.[23] MR. JUSTICE MARSHALL's dissenting opinion would discard these fixed principles in favor of a judicial inventiveness that would go "far toward making this Court a 'super-legislature.' " *Shapiro* v. *Thompson, supra,* at 655, 661 (Harlan, J., dissenting). We are not free to do so.

More than 100 years ago the Court unanimously held that "the Constitution of the United States does not confer the right of suffrage upon any one. . . ." *Minor* v. *Happersett,* 21 Wall. 162, 178. See *Lassiter* v. *Northampton Election Bd.,* 360 U. S., at 50–51. It is for the States "to determine the conditions under which the right of suffrage may be

[23] The presumption of constitutional validity that underlies the settled mode of reviewing legislation disappears, of course, if the law under consideration creates classes that, in a constitutional sense, are inherently "suspect." See *McLaughlin* v. *Florida,* 379 U. S. 184; *Strauder* v. *West Virginia,* 100 U. S. 303. Cf. *Lockport* v. *Citizens for Community Action,* 430 U. S. 259.

exercised . . . , absent of course the discrimination which the Constitution condemns," *ibid.* It is true, as the dissenting opinion states, that the Equal Protection Clause confers a substantive right to participate in elections on an equal basis with other qualified voters. See *Dunn* v. *Blumstein,* 405 U. S. 330, 336; *Reynolds* v. *Sims,* 377 U. S., at 576. But this right to equal participation in the electoral process does not protect any "political group," however defined, from electoral defeat.[24]

The dissenting opinion erroneously discovers the asserted entitlement to group representation within the "one person, one vote" principle of *Reynolds* v. *Sims, supra,* and its progeny.[25] Those cases established that the Equal Protection

---

[24] The basic fallacy in the dissenting opinion's theory is illustrated by analogy to a defendant's right under the Sixth and Fourteenth Amendments to a trial by a jury of his peers in a criminal case. See *Duncan* v. *Louisiana,* 391 U. S. 145. That right, expressly conferred by the Constitution, is certainly "fundamental" as that word is used in the dissenting opinion. Moreover, under the Equal Protection Clause, a defendant has a right to require that the State not exclude from the jury members of his race. See *Castaneda* v. *Partida,* 430 U. S., at 493. But "[f]airness in selection has never been held to require proportional representation of races upon a jury," *Akins* v. *Texas,* 325 U. S. 398, 403; nor has the defendant any "right to demand that members of his race be included," *Alexander* v. *Louisiana,* 405 U. S. 625, 628. The absence from a jury of persons belonging to racial or other cognizable groups offends the Constitution only "if it results from purposeful discrimination." *Castaneda* v. *Partida, supra,* at 493. See *Alexander* v. *Louisiana, supra;* see also *Washington* v. *Davis,* 426 U. S., at 239–240. Thus, the fact that there is a constitutional right to a system of jury selection that is not purposefully exclusionary does not entail a right to a jury of any particular racial composition. Likewise, the fact that the Equal Protection Clause confers a right to participate in elections on an equal basis with other qualified voters does not entail a right to have one's candidates prevail.

[25] The dissenting opinion also relies upon several decisions of this Court that have held constitutionally invalid various voter eligibility requirements: *Dunn* v. *Blumstein,* 405 U. S. 330 (length of residence requirement); *Evans* v. *Cornman,* 398 U. S. 419 (exclusion of residents of federal property); *Kramer* v. *Union School District,* 395 U. S. 621 (property

Clause guarantees the right of each voter to "have his vote weighted equally with those of all other citizens." 377 U. S., at 576. The Court recognized that a voter's right to "have an equally effective voice" in the election of representatives is impaired where representation is not apportioned substantially on a population basis. In such cases, the votes of persons in more populous districts carry less weight than do those of persons in smaller districts. There can be, of course, no claim that the "one person, one vote" principle has been violated in this case, because the city of Mobile is a unitary electoral district and the Commission elections are conducted at large. It is therefore obvious that nobody's vote has been "diluted" in the sense in which that word was used in the *Reynolds* case.

The dissenting opinion places an extraordinary interpretation on these decisions, an interpretation not justified by *Reynolds* v. *Sims* itself or by any other decision of this Court. It is, of course, true that the right of a person to vote on an equal basis with other voters draws much of its significance from the political associations that its exercise reflects, but it is an altogether different matter to conclude that political groups themselves have an independent constitutional claim to representation.[26] And the Court's decisions hold squarely

---

or status requirement); *Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663 (poll tax requirement). But there is in this case no attack whatever upon any of the voter eligibilty requirements in Mobile. Nor do the cited cases contain implicit support for the position of the dissenting opinion. They stand simply for the proposition that "if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest." *Kramer* v. *Union School District, supra,* at 627. It is difficult to perceive any similarity between the excluded person's right to equal electoral participation in the cited cases, and the right asserted by the dissenting opinion in the present case, aside from the fact that they both in some way involve voting.

[26] It is difficult to perceive how the implications of the dissenting opin-

that they do not. See *United Jewish Organizations* v. *Carey,* 430 U. S. 144, 166–167; *id.,* at 179–180 (opinion concurring in judgment); *White* v. *Regester,* 412 U. S., at 765–766; *Whitcomb* v. *Chavis,* 403 U. S., at 149–150, 153–154, 156–157.

The fact is that the Court has sternly set its face against the claim, however phrased, that the Constitution somehow guarantees proportional representation. In *Whitcomb* v. *Chavis, supra,* the trial court had found that a multimember state legislative district had invidiously deprived Negroes and poor persons of rights guaranteed them by the Constitution, notwithstanding the absence of any evidence whatever of discrimination against them. Reversing the trial court, this Court said:

> "The District Court's holding, although on the facts of this case limited to guaranteeing one racial group representation, is not easily contained. It is expressive of the more general proposition that any group with distinctive interests must be represented in legislative halls if it is numerous enough to command at least one seat and repre-

ion's theory of group representation could rationally be cabined. Indeed, certain preliminary practical questions immediately come to mind: Can only members of a minority of the voting population in a particular municipality be members of a "political group"? How large must a "group" be to be a "political group"? Can any "group" call itself a "political group"? If not, who is to say which "groups" are "political groups"? Can a qualified voter belong to more than one "political group"? Can there be more than one "political group" among white voters (*e. g.,* Irish-American, Italian-American, Polish-American, Jews, Catholics, Protestants)? Can there be more than one "political group" among nonwhite voters? Do the answers to any of these questions depend upon the particular demographic composition of a given city? Upon the total size of its voting population? Upon the size of its governing body? Upon its form of government? Upon its history? Its geographic location? The fact that even these preliminary questions may be largely unanswerable suggests some of the conceptual and practical fallacies in the constitutional theory espoused by the dissenting opinion, putting to one side the total absence of support for that theory in the Constitution itself.

sents a majority living in an area sufficiently compact to constitute a single-member district. This approach would make it difficult to reject claims of Democrats, Republicans, or members of any political organization in Marion County who live in what would be safe districts in a single-member district system but who in one year or another, or year after year, are submerged in a one-sided multi-member district vote. There are also union oriented workers, the university community, religious or ethnic groups occupying identifiable areas of our heterogeneous cities and urban areas. Indeed, it would be difficult for a great many, if not most, multi-member districts to survive analysis under the District Court's view unless combined with some voting arrangement such as proportional representation or cumulative voting aimed at providing representation for minority parties or interests. At the very least, affirmance of the District Court would spawn endless litigation concerning the multimember district systems now widely employed in this country." *Whitcomb* v. *Chavis, supra,* at 156–157 (footnotes omitted).

## V

The judgment is reversed, and the case is remanded to the Court of Appeals for further proceedings.

*It is so ordered.*

MR. JUSTICE BLACKMUN, concurring in the result.

Assuming that proof of intent is a prerequisite to appellees' prevailing on their constitutional claim of vote dilution, I am inclined to agree with MR. JUSTICE WHITE that, in this case, "the findings of the District Court amply support an inference of purposeful discrimination," *post,* at 103. I concur in the Court's judgment of reversal, however, because I believe that the relief afforded appellees by the District Court was not commensurate with the sound exercise of judicial discretion.

It seems to me that the city of Mobile, and its citizenry, have a substantial interest in maintaining the commission form of government that has been in effect there for nearly 70 years. The District Court recognized that its remedial order, changing the form of the city's government to a mayor-council system, "raised serious constitutional issues." 423 F. Supp. 384, 404 (SD Ala. 1976). Nonetheless, the court was "unable to see how the impermissibly unconstitutional dilution can be effectively corrected by any other approach." *Id.*, at 403.

The Court of Appeals approved the remedial measures adopted by the District Court and did so essentially on three factors: (1) this Court's preference for single-member districting in court-ordered legislative reapportionment, absent special circumstances, see, *e. g., Connor* v. *Finch*, 431 U. S. 407, 415 (1977); (2) appellants' noncooperation with the District Court's request for the submission of proposed municipal government plans that called for single-member districts for councilmen, under a mayor-council system of government; and (3) the temporary nature of the relief afforded by the District Court, the city or State being free to adopt a "constitutional replacement" for the District Court's plan in the future. 571 F. 2d 238, 247 (CA5 1978).

Contrary to the Court of Appeals, I believe that special circumstances are presented when a District Court "reapportions" a municipal government by altering its basic structures. See also the opinion of MR. JUSTICE STEWART, *ante,* at 70, and n. 15. See *Chapman* v. *Meier*, 420 U. S. 1, 20, n. 14 (1975); *Sixty-Seventh Minnesota State Senate* v. *Beens*, 406 U. S. 187 (1972). I also believe that the city's failure to submit a proposed plan to the District Court was excused by the fact that the only proposals the court was interested in receiving were variations on a mayor-council plan utilizing single-member districts. Finally, although the District Court's order may have been temporary, it was unlikely that the courts below would have approved any attempt by Mobile to return to the commission form of government. And even

a temporary alteration of a long-established form of municipal government is a drastic measure for a court to take.

Contrary to the District Court, I do not believe that, in order to remedy the unconstitutional vote dilution it found, it was necessary to convert Mobile's city government to a mayor-council system. In my view, the District Court at least should have considered alternative remedial orders that would have maintained some of the basic elements of the commission system Mobile long ago had selected—joint exercise of legislative and executive power, and citywide representation. In the first place, I see no reason for the court to have separated legislative and executive power in the city of Mobile by creating the office of mayor. In the second place, the court could have, and in my view should have, considered expanding the size of the Mobile City Commission and providing for the election of at least some commissioners at large. Alternative plans might have retained at-large elections for all commissioners while imposing district residency requirements that would have insured the election of a commission that was a cross section of all of Mobile's neighborhoods, or a plurality-win system that would have provided the potential for the effective use of single-shot voting by black voters. See *City of Rome* v. *United States, post,* at 184, n. 19. In failing to consider such alternative plans, it appears to me that the District Court was perhaps overly concerned with the elimination of at-large elections *per se,* rather than with structuring an electoral system that provided an opportunity for black voters in Mobile to participate in the city's government on an equal footing with whites.

In the past, this Court has emphasized that a district court's remedial power "may be exercised only on the basis of a constitutional violation," and that "the nature of the violation determines the scope of the remedy." *Swann* v. *Board of Education,* 402 U. S. 1, 16 (1971). I am not convinced that any violation of federal constitutional rights established by appellees required the District Court to dismantle Mobile's

commission form of government and replace it with a mayor-council system. Accordingly, I, too, would reverse the judgment of the Court of Appeals, and remand the case for reconsideration of an appropriate remedy.

MR. JUSTICE STEVENS, concurring in the judgment.

At issue in this case is the constitutionality of the city of Mobile's commission form of government. Black citizens in Mobile, who constitute a minority of that city's registered voters, challenged the at-large nature of the elections for the three positions of City Commissioner, contending that the system "dilutes" their votes in violation of the Fifteenth Amendment and the Equal Protection Clause of the Fourteenth Amendment. While I agree with MR. JUSTICE STEWART that no violation of respondents' constitutional rights has been demonstrated, my analysis of the issue proceeds along somewhat different lines.

In my view, there is a fundamental distinction between state action that inhibits an individual's right to vote and state action that affects the political strength of various groups that compete for leadership in a democratically governed community. That distinction divides so-called vote dilution practices into two different categories "governed by entirely different constitutional considerations," see *Wright* v. *Rockefeller*, 376 U. S. 52, 58 (Harlan, J., concurring).

In the first category are practices such as poll taxes or literacy tests that deny individuals access to the ballot. Districting practices that make an individual's vote in a heavily populated district less significant than an individual's vote in a smaller district also belong in that category. See *Baker* v. *Carr*, 369 U. S. 186; *Reynolds* v. *Sims*, 377 U. S. 533.[1] Such

---

[1] In *Reynolds* v. *Sims*, the Court quoted Mr. Justice Douglas' statement that the right to vote "includes the right to have the vote counted at full value without dilution or discount . . . ," 377 U. S., at 555, n. 29, as well as the comment in *Wesberry* v. *Sanders*, 376 U. S. 1, 8, that " 'one

practices must be tested by the strictest of constitutional standards, whether challenged under the Fifteenth Amendment or under the Equal Protection Clause of the Fourteenth Amendment. See, *e. g., Dunn* v. *Blumstein*, 405 U. S. 330, 337.

This case does not fit within the first category. The District Court found that black citizens in Mobile "register and vote without hindrance"[2] and there is no claim that any individual's vote is worth less than any other's. Rather, this case draws into question a political structure that treats all individuals as equals but adversely affects the political strength of a racially identifiable group. Although I am satisfied that such a structure may be challenged under the Fifteenth Amendment as well as under the Equal Protection Clause of the Fourteenth Amendment,[3] I believe that under

man's vote in a congressional election is to be worth as much as another's.'" 377 U. S., at 559.

[2] This finding distinguishes this case from *White* v. *Regester*, 412 U. S. 755. In *White* the Court held that, in order to establish a Fourteenth Amendment violation, a group alleging vote dilution must

"produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." *Id.*, at 766.

The Court affirmed a judgment in favor of black and Mexican-American voters on the basis of the District Court's express findings that black voters had been " 'effectively excluded from participation in the Democratic primary selection process,'" *id.*, at 767, and that " '. . . cultural incompatibility . . . conjoined with the poll tax and the most restrictive voter registration procedures in the nation ha[d] operated to effectively deny Mexican-Americans access to the political processes in Texas even longer than the Blacks were formally denied access by the white primary.'" *Id.*, at 768.

[3] Thus, I disagree with MR. JUSTICE STEWART's conclusion for the plurality that the Fifteenth Amendment applies only to practices that directly affect access to the ballot and hence is totally inapplicable to the case at bar. *Ante*, at 65. I also find it difficult to understand why, given this position, he reaches out to decide that discriminatory purpose must be demonstrated in a proper Fifteenth Amendment case. *Ante*, at 61–64.

either provision it must be judged by a standard that allows the political process to function effectively.

My conclusion that the Fifteenth Amendment applies to a case such as this rests on this Court's opinion in *Gomillion* v. *Lightfoot*, 364 U. S. 339. That case established that the Fifteenth Amendment does not simply guarantee the individual's right to vote; it also limits the States' power to draw political boundaries. Although *Gomillion* involved a districting structure that completely excluded the members of one race from participation in the city's elections,[4] it does not stand for the proposition that no racial group can prevail on a Fifteenth Amendment claim unless it proves that an electoral system has the effect of making its members' right to vote, in MR. JUSTICE MARSHALL's words, "nothing more than the right to cast meaningless ballots." *Post*, at 104. I agree with MR. JUSTICE MARSHALL that the Fifteenth Amendment need not and should not be so narrowly construed. I do not agree, however, with his view that every "showing of discriminatory impact" on a historically and socially disadvan-

---

[4] "The petitioners here complain that affirmative legislative action deprives them of their votes and the consequent advantages that the ballot affords. When a legislature thus singles out a readily isolated segment of a racial minority for special discriminatory treatment, it violates the Fifteenth Amendment. In no case involving unequal weight in voting distribution that has come before the Court did the decision sanction a differentiation on racial lines whereby approval was given to unequivocal withdrawal of the vote solely from colored citizens.

.     .     .     .     .

"According to the allegations here made, the Alabama Legislature has not merely redrawn the Tuskegee city limits with incidental inconvenience to the petitioners; it is more accurate to say that it has deprived the petitioners of the municipal franchise and consequent rights and to that end it has incidentally changed the city's boundaries. While in form this is merely an act redefining metes and bounds, if the allegations are established, the inescapable human effect of this essay in geometry and geography is to despoil colored citizens, and only colored citizens, of their theretofore enjoyed voting rights." 364 U. S., at 346, 347.

taged racial group, *post,* at 104, 111, n. 7, is sufficient to invalidate a districting plan.[5]

Neither *Gomillion* nor any other case decided by this Court establishes a constitutional right to proportional representation for racial minorities.[6] What *Gomillion* holds is that a sufficiently "uncouth" or irrational racial gerrymander violates the Fifteenth Amendment. As Mr. Justice Whittaker's concurrence in that case demonstrates, the same result is compelled by the Equal Protection Clause of the Fourteenth Amendment. See 364 U. S., at 349. The fact that the "gerrymander" condemned in *Gomillion* was equally vulnerable under both Amendments indicates that the essential holding of that case is applicable, not merely to gerrymanders directed against racial minorities, but to those aimed at religious, ethnic, economic, and political groups as well. Whatever the proper standard for identifying an unconstitutional gerrymander may be, I have long been persuaded that it must apply equally to all forms of political gerrymandering—not just to racial gerrymandering. See *Cousins* v. *City Council*

---

[5] I also disagree with MR. JUSTICE MARSHALL to the extent that he implies that the votes cast in an at-large election by members of a racial minority can never be anything more than "meaningless ballots." I have no doubt that analyses of Presidential, senatorial and other statewide elections would demonstrate that ethnic and racial minorities have often had a critical impact on the choice of candidates and the outcome of elections. There is no reason to believe that the same political forces cannot operate in smaller election districts regardless of the depth of conviction or emotion that may separate the partisans of different points of view.

[6] And this is true regardless of the apparent need of a particular group for proportional representation because of its historically disadvantaged position in the community. See *Cousins* v. *City Council of Chicago,* 466 F. 2d 830, 852 (CA7 1972) (Stevens, J., dissenting), cert. denied, 409 U. S. 893. This does not mean, of course, that a legislature is constitutionally prohibited from according some measure of proportional representation to a minority group, see *United Jewish Organizations* v. *Carey,* 430 U. S. 144.

*of Chicago,* 466 F. 2d 830, 848–852 (CA7 1972) (Stevens, J., dissenting), cert. denied, 409 U. S. 893.[7]

This conclusion follows, I believe, from the very nature of a gerrymander. By definition, gerrymandering involves drawing district boundaries (or using multimember districts or at-large elections) in order to maximize the voting strength of those loyal to the dominant political faction and to minimize the strength of those opposed to it.[8] 466 F. 2d, at 847. In seeking the desired result, legislators necessarily make judgments about the probability that the members of certain identifiable groups, whether racial, ethnic, economic, or religious, will vote in the same way. The success of the gerrymander from the legislators' point of view, as well as its impact on the

---

[7] This view is consistent with the Court's Fourteenth Amendment cases in which it has indicated that attacks on apportionment schemes on racial, political, or economic grounds should all be judged by the same constitutional standard. See, *e. g., Whitcomb* v. *Chavis,* 403 U. S. 124, 149 (districts that are "conceived or, operated as purposeful devices to further racial *or economic* discrimination" are prohibited by the Fourteenth Amendment) (emphasis supplied); *Fortson* v. *Dorsey,* 379 U. S. 433, 439 (an apportionment scheme would be invalid under the Fourteenth Amendment if it "operate[d] to minimize or cancel out the voting strength of racial *or political* elements of the voting population") (emphasis supplied).

[8] Gerrymanders may also be used to preserve the current balance of power between political parties, see, *e. g., Gaffney* v. *Cummings,* 412 U. S. 735, or to preserve the safe districts of incumbents, cf. *Wright* v. *Rockefeller,* 376 U. S. 52. In *Gaffney* the Court pointed out: "[I]t requires no special genius to recognize the political consequences of drawing a district line along one street rather than another. It is not only obvious, but absolutely unavoidable, that the location and shape of districts may well determine the political complexion of the area. District lines are rarely neutral phenomena. They can well determine what district will be predominantly Democratic or predominantly Republican, or make a close race likely. Redistricting may pit incumbents against one another or make very difficult the election of the most experienced legislator. The reality is that districting inevitably has and is intended to have substantial political consequences." 412 U. S., at 753.

disadvantaged group, depends on the accuracy of those predictions.

A prediction based on a racial characteristic is not necessarily more reliable than a prediction based on some other group characteristic. Nor, since a legislator's ultimate purpose in making the prediction is political in character, is it necessarily more invidious or benign than a prediction based on other group characteristics.[9] In the line-drawing process, racial, religious, ethnic, and economic gerrymanders are all species of political gerrymanders.

From the standpoint of the groups of voters that are affected by the line-drawing process, it is also important to recognize that it is the group's interest in gaining or maintaining political power that is at stake. The mere fact that a number of citizens share a common ethnic, racial, or religious background does not create the need for protection against gerrymandering. It is only when their common interests are strong enough to be manifested in political action that the need arises. For the political strength of a group is not a function of its ethnic, racial, or religious composition; rather, it is a function of numbers—specifically the number of persons who will vote in the same way. In the long run there is no more certainty that individual members of racial groups will vote alike than that members of other identifiable groups will do so. And surely there is no national interest in creating an incentive to define political groups by racial characteristics.[10]

---

[9] Thus, for example, there is little qualitative difference between the motivation behind a religious gerrymander designed to gain votes on the abortion issue and a racial gerrymander designed to gain votes on an economic issue.

[10] As Mr. Justice Douglas wrote in his dissent in *Wright* v. *Rockefeller*:

"Racial electoral registers, like religious ones, have no place in a society that honors the Lincoln tradition—'of the people, by the people, for the people.' Here the individual is important, not his race, his creed, or his color. The principle of equality is at war with the notion that District A must be represented by a Negro, as it is with the notion that District B

But if the Constitution were interpreted to give more favorable treatment to a racial minority alleging an unconstitutional impairment of its political strength than it gives to other identifiable groups making the same claim, such an incentive would inevitably result.

My conclusion that the same standard should be applied to racial groups as is applied to other groups leads me also to

must be represented by a Caucasian, District C by a Jew, District D by a Catholic, and so on. Cf. *Gray* v. *Sanders,* 372 U. S. 368, 379. The racial electoral register system weights votes along one racial line more heavily than it does other votes. That system, by whatever name it is called, is a divisive force in a community, emphasizing differences between candidates and voters that are irrelevant in the constitutional sense. Of course race, like religion, plays an important role in the choices which individual voters make from among various candidates. But government has no business designing electoral districts along racial or religious lines.

> "When racial or religious lines are drawn by the State, the multiracial, multireligious communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race or to religion rather than to political issues are generated; communities seek not the best representative but the best racial or religious partisan. Since that system is at war with the democratic ideal, it should find no footing here." 376 U. S., at 66–67.

See also my dissent in *Cousins, supra:*

> "In my opinion an interpretation of the Constitution which afforded one kind of political protection to blacks and another kind to members of other identifiable groups would itself be invidious. Respect for the citizenry in the black community compels acceptance of the fact that in the long run there is no more certainty that these individuals will vote alike than will individual members of any other ethnic, economic, or social group. The probability of parallel voting fluctuates as the blend of political issues affecting the outcome of an election changes from time to time to emphasize one issue, or a few, rather than others, as dominant. The facts that a political group has its own history, has suffered its own special injustices, and has its own congeries of special political interests, do not make one such group different from any other in the eyes of the law. The members of each go to the polls with equal dignity and with an equal right to be protected from invidious discrimination." 466 F. 2d, at 852.

conclude that the standard cannot condemn every adverse impact on one or more political groups without spawning more dilution litigation than the judiciary can manage. Difficult as the issues engendered by *Baker* v. *Carr,* 369 U. S. 186, may have been, nothing comparable to the mathematical yardstick used in apportionment cases is available to identify the difference between permissible and impermissible adverse impacts on the voting strength of political groups.

In its prior cases the Court has phrased the standard as being whether the districting practices in question "unconstitutionally operate to dilute or cancel the voting strength of racial or political elements." *Whitcomb* v. *Chavis,* 403 U. S. 124, 144. In *Zimmer* v. *McKeithen,* 485 F. 2d 1297 (CA5 1973), aff'd on other grounds *sub nom. East Carroll Parish School Bd.* v. *Marshall,* 424 U. S. 636, the Fifth Circuit attempted to outline the types of proof that would satisfy this rather amorphous test. Today, the plurality rejects the *Zimmer* analysis, holding that the primary, if not the sole, focus of the inquiry must be on the intent of the political body responsible for making the districting decision. While I agree that the *Zimmer* analysis should be rejected, I do not believe that it is appropriate to focus on the subjective intent of the decisionmakers.

In my view, the proper standard is suggested by three characteristics of the gerrymander condemned in *Gomillion:* (1) the 28-sided configuration was, in the Court's word, "uncouth," that is to say, it was manifestly not the product of a routine or a traditional political decision; (2) it had a significant adverse impact on a minority group; and (3) it was unsupported by any neutral justification and thus was either totally irrational or entirely motivated by a desire to curtail the political strength of the minority. These characteristics suggest that a proper test should focus on the objective effects of the political decision rather than the subjective motivation of the decisionmaker. See *United States* v. *O'Brien,* 391 U. S.

367, 384.[11]   In this case, if the commission form of government in Mobile were extraordinary, or if it were nothing more than a vestige of history, with no greater justification than the grotesque figure in *Gomillion*, it would surely violate the Constitution.   That conclusion would follow simply from its adverse impact on black voters plus the absence of any legitimate justification for the system, without reference to the subjective intent of the political body that has refused to alter it.

Conversely, I am also persuaded that a political decision that affects group voting rights may be valid even if it can be proved that irrational or invidious factors have played some part in its enactment or retention.[12]   The standard for testing the acceptability of such a decision must take into account the fact that the responsibility for drawing political boundaries is generally committed to the legislative process and that the process inevitably involves a series of compromises among different group interests.   If the process is to work, it must reflect an awareness of group interests and it must tolerate some attempts to advantage or to disadvantage particular segments of the voting populace.   Indeed, the same "group interest" may simultaneously support and oppose a particular boundary change.[13]   The standard cannot, therefore, be so

---

[11] In *O'Brien* the Court described *Gomillion* as standing "not for the proposition that legislative motive is a proper basis for declaring a statute unconstitutional, but that the inevitable effect of a statute on its face may render it unconstitutional."

[12] "It is unrealistic, on the one hand, to require the victim of alleged discrimination to uncover the actual subjective intent of the decisionmaker or, conversely, to invalidate otherwise legitimate action simply because an improper motive affected the deliberation of a participant in the decisional process.   A law conscripting clerics should not be invalidated because an atheist voted for it." *Washington* v. *Davis*, 426 U. S. 229, 253 (STEVENS, J., concurring).

[13] For example, if 55% of the voters in an area comprising two districts belong to group A, their interests in electing two representatives would be best served by evenly dividing the voters in two districts, but their inter-

strict that any evidence of a purpose to disadvantage a bloc of voters will justify a finding of "invidious discrimination"; otherwise, the facts of political life would deny legislatures the right to perform the districting function. Accordingly, a political decision that is supported by valid and articulable justifications cannot be invalid simply because some participants in the decisionmaking process were motivated by a purpose to disadvantage a minority group.

The decision to retain the commission form of government in Mobile, Ala., is such a decision. I am persuaded that some support for its retention comes, directly or indirectly, from members of the white majority who are motivated by a desire to make it more difficult for members of the black minority to serve in positions of responsibility in city government. I deplore that motivation and wish that neither it nor any other irrational prejudice played any part in our political processes. But I do not believe otherwise legitimate political choices can be invalidated simply because an irrational or invidious purpose played some part in the decisionmaking process.

As MR. JUSTICE STEWART points out, Mobile's basic election system is the same as that followed by literally thousands of municipalities and other governmental units throughout the Nation. *Ante*, at 60.[14] The fact that these at-large systems

---

ests in making sure that they elect at least one representative would be served by concentrating a larger majority in one district. See *Cousins* v. *City Council of Chicago,* 466 F. 2d, at 855, n. 30 (Stevens, J., dissenting). See also *Wright* v. *Rockefeller,* 376 U. S. 52, where the maintenance of racially separate congressional districts was challenged by one group of blacks and supported by another group having the dominant power in the black-controlled district.

[14] I emphasize this point because in my opinion there is a significant difference between a statewide legislative plan that "happens" to use multimember districts only in those areas where they disadvantage discrete minority groups and the use of a generally acceptable municipal form of government that involves the election of commissioners by the

characteristically place one or more minority groups at a sig-
nificant disadvantage in the struggle for political power cannot
invalidate all such systems.  See *Whitcomb* v. *Chavis,* 403 U. S.,
at 156–160.  Nor can it be the law that such systems are
valid when there is no evidence that they were instituted or
maintained for discriminatory reasons, but that they may be
selectively condemned on the basis of the subjective motiva-
tion of some of their supporters.  A contrary view "would
spawn endless litigation concerning the multi-member district
systems now widely employed in this country," *id.,* at 157, and
would entangle the judiciary in a voracious political thicket.[15]

---

voters at large.  While it is manifest that there is a substantial neutral
justification for a municipality's choice of a commission form of govern-
ment, it is by no means obvious that an occasional multimember district
in a State which typically uses single-member districts can be adequately
explained on neutral grounds.  Nothing in the Court's opinion in *White* v.
*Regester,* 412 U. S. 755, describes any purported neutral explanation for
the multimember districts in Bexar and Dallas Counties.  In this connec-
tion, it should be remembered that *Kilgarlin* v. *Hill,* 386 U. S. 120, did not
uphold the constitutionality of a "crazy quilt" of single-member and
multimember districts; rather, in that case this Court merely upheld the
findings by the District Court that the plaintiffs had failed to prove their
allegations that the districting plan constituted such a crazy quilt.

[15] Rejection of Mr. Justice Frankfurter's views in the specific con-
troversy presented by *Baker* v. *Carr,* 369 U. S. 186, does not refute the
basic wisdom of his call for judicially manageable standards in this area:
"Disregard of inherent limits in the effective exercise of the Court's 'judi-
cial Power' not only presages the futility of judicial intervention in the
essentially political conflict of forces by which the relation between popula-
tion and representation has time out of mind been and now is determined.
It may well impair the Court's position as the ultimate organ of 'the
supreme Law of the Land' in that vast range of legal problems, often
strongly entangled in popular feeling, on which this Court must pronounce.
The Court's authority—possessed of neither the purse nor the sword—
ultimately rests on sustained public confidence in its moral sanction.  Such
feeling must be nourished by the Court's complete detachment, in fact and
in appearance, from political entanglements and by abstention from inject-
ing itself into the clash of political forces in political settlements." *Id.,*
at 267 (Frankfurter, J., dissenting).

In sum, I believe we must accept the choice to retain Mobile's commission form of government as constitutionally permissible even though that choice may well be the product of mixed motivation, some of which is invidious. For these reasons I concur in the judgment of reversal.

MR. JUSTICE BRENNAN, dissenting.*

I dissent because I agree with MR. JUSTICE MARSHALL that proof of discriminatory impact is sufficient in these cases. I also dissent because, even accepting the plurality's premise that discriminatory purpose must be shown, I agree with MR. JUSTICE MARSHALL and MR. JUSTICE WHITE that the appellees have clearly met that burden.

MR. JUSTICE WHITE, dissenting.

In *White* v. *Regester,* 412 U. S. 755 (1973), this Court unanimously held the use of multimember districts for the election of state legislators in two counties in Texas violated the Equal Protection Clause of the Fourteenth Amendment because, based on a careful assessment of the totality of the circumstances, they were found to exclude Negroes and Mexican-Americans from effective participation in the political processes in the counties. Without questioning the vitality of *White* v. *Regester* and our other decisions dealing with challenges to multimember districts by racial or ethnic groups, the Court today inexplicably rejects a similar holding based on meticulous factual findings and scrupulous application of the principles of these cases by both the District Court and the Court of Appeals. The Court's decision is flatly inconsistent with *White* v. *Regester* and it cannot be understood to flow from our recognition in *Washington* v. *Davis,* 426 U. S. 229 (1976), that the Equal Protection Clause forbids only purposeful discrimination. Both the District Court and the

---

*[This opinion applies also to No. 78-357, *Williams et al.* v. *Brown et al., post,* p. 236.]

Court of Appeals properly found that an invidious discriminatory purpose could be inferred from the totality of facts in this case. The Court's cryptic rejection of their conclusions ignores the principles that an invidious discriminatory purpose can be inferred from objective factors of the kind relied on in *White* v. *Regester* and that the trial courts are in a special position to make such intensely local appraisals.

## I

Prior to our decision in *White* v. *Regester*, we upheld a number of multimember districting schemes against constitutional challenges, but we consistently recognized that such apportionment schemes could constitute invidious discrimination "where the circumstances of a particular case may 'operate to minimize or cancel out the voting strength of racial or political elements of the voting population.'" *Whitcomb* v. *Chavis*, 403 U. S. 124, 143 (1971), quoting from *Fortson* v. *Dorsey*, 379 U. S. 433, 439 (1965); *Burns* v. *Richardson*, 384 U. S. 73, 88 (1966). In *Whitcomb* v. *Chavis*, *supra*, we noted that the fact that the number of members of a particular group who were legislators was not in proportion to the population of the group did not prove invidious discrimination absent evidence and findings that the members of the group had less opportunity than did other persons "to participate in the political processes and to elect legislators of their choice." 403 U. S., at 149.

Relying on this principle, in *White* v. *Regester* we unanimously upheld a District Court's conclusion that the use of multimember districts in Dallas and Bexar Counties in Texas violated the Equal Protection Clause in the face of findings that they excluded Negroes and Mexican-Americans from effective participation in the political processes. With respect to the exclusion of Negroes in Dallas County, "the District Court first referred to the history of official racial discrimination in Texas, which at times touched the right of Negroes to register and vote and to participate in the democratic

processes." 412 U. S., at 766. The District Court also referred to Texas' majority vote requirement and "place" rule, "neither in themselves improper nor invidious," but which "enhanced the opportunity for racial discrimination" by reducing legislative elections from the multimember district to "a head-to-head contest for each position." *Ibid.* We deemed more fundamental the District Court's findings that only two Negro state representatives had been elected from Dallas County since Reconstruction and that these were the only two Negroes ever slated by an organization that effectively controlled Democratic Party candidate slating. *Id.*, at 766–767. We also noted the District Court's findings that the Democratic Party slating organization was insensitive to the needs and aspirations of the Negro community and that at times it had employed racial campaign tactics to defeat candidates supported by the black community. Based on this evidence, the District Court concluded that the black community generally was "not permitted to enter into the political process in a reliable and meaningful manner." *Id.*, at 767. We held that "[t]hese findings and conclusions are sufficient to sustain the District Court's judgment with respect to the Dallas multimember district and, on this record, we have no reason to disturb them." *Ibid.*

With respect to the exclusion of Mexican-Americans from the political process in Bexar County, the District Court referred to the continuing effects of a long history of invidious discrimination against Mexican-Americans in education, employment, economics, health, politics, and other fields. *Id.*, at 768. The impact of this discrimination, coupled with a cultural and language barrier, made Mexican-American participation in the political life of Bexar County extremely difficult. Only five Mexican-Americans had represented Bexar County in the Texas Legislature since 1880, and the county's legislative delegation "was insufficiently responsive to Mexican-American interests." *Id.*, at 769. "Based on the totality of the circumstances, the District Court evolved its

ultimate assessment of the multimember district, overlaid, as it was, on the cultural and economic realities of the Mexican-American community in Bexar County and its relationship with the rest of the county." *Ibid.* "[F]rom its own special vantage point" the District Court concluded that the multimember district invidiously excluded Mexican-Americans from effective participation in the election of state representatives. We affirmed, noting that we were "not inclined to overturn these findings, representing as they do a blend of history and an intensely local appraisal of the design and impact of the Bexar County multimember district in the light of past and present reality, political and otherwise." *Id.,* at 769–770.

## II

In the instant case the District Court and the Court of Appeals faithfully applied the principles of *White* v. *Regester* in assessing whether the maintenance of a system of at-large elections for the selection of Mobile City Commissioners denied Mobile Negroes their Fourteenth and Fifteenth Amendment rights. Scrupulously adhering to our admonition that "[t]he plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question," *id.,* at 766, the District Court conducted a detailed factual inquiry into the openness of the candidate selection process to blacks. The court noted that "Mobile blacks were subjected to massive official and private racial discrimination until the Voting Rights Act of 1965" and that "[t]he pervasive effects of past discrimination still substantially affec[t] black political participation." 423 F. Supp. 384, 387 (SD Ala. 1976). Although the District Court noted that "[s]ince the Voting Rights Act of 1965, blacks register and vote without hindrance," the court found that "local political processes are not equally open" to blacks. Despite the fact that Negroes constitute more than 35% of the population of Mobile, no Negro has ever been elected to the Mobile

City Commission. The plaintiffs introduced extensive evidence of severe racial polarization in voting patterns during the 1960's and 1970's with "white voting for white and black for black if a white is opposed to a black," resulting in the defeat of the black candidate or, if two whites are running, the defeat of the white candidate most identified with blacks. *Id.*, at 388. Regression analyses covering every City Commission race in 1965, 1969, and 1973, both the primary and general election of the county commission in 1968 and 1972, selected school board races in 1962, 1966, 1970, 1972, and 1974, city referendums in 1963 and 1973, and a countywide legislative race in 1969 confirmed the existence of severe bloc voting. *Id.*, at 388–389. Nearly every active candidate for public office testified that because of racial polarization "it is highly unlikely that anytime in the foreseeable future, under the at-large system, . . . a black can be elected against a white." *Id.*, at 388. After single-member districts were created in Mobile County for state legislative elections, "three blacks of the present fourteen member Mobile County delegation have been elected." *Id.*, at 389. Based on the foregoing evidence, the District Court found "that the structure of the at-large election of city commissioners combined with strong racial polarization of Mobile's electorate continues to effectively discourage qualified black citizens from seeking office or being elected thereby denying blacks equal access to the slating or candidate selection process." *Ibid.*

The District Court also reviewed extensive evidence that the City Commissioners elected under the at-large system have not been responsive to the needs of the Negro community. The court found that city officials have been unresponsive to the interests of Mobile Negroes in municipal employment, appointments to boards and committees, and the provision of municipal services in part because of "the political fear of a white backlash vote when black citizens' needs are at stake." *Id.*, at 392. The court also found that there is no clear-cut state policy preference for at-large elections and that past dis-

crimination affecting the ability of Negroes to register and to vote "has helped preclude the effective participation of blacks in the election system today." *Id.,* at 393. The adverse impact of the at-large election system on minorities was found to be enhanced by the large size of the citywide election district, the majority vote requirement, the provision that candidates run for positions by place or number, and the lack of any provision for at-large candidates to run from particular geographical subdistricts.

After concluding its extensive findings of fact, the District Court addressed the question of the effect of *Washington* v. *Davis,* 426 U. S. 229 (1976), on the *White* v. *Regester* standards. The court concluded that the requirement that a facially neutral statute involve purposeful discrimination before a violation of the Equal Protection Clause can be established was not inconsistent with *White* v. *Regester* in light of the recognition in *Washington* v. *Davis, supra,* at 241–242, that the discriminatory purpose may often be inferred from the totality of the relevant facts, including the discriminatory impact of the statute. 423 F. Supp., at 398. After noting that "whenever a redistricting bill of any type is proposed by a county delegation member, a major concern has centered around how many, if any, blacks would be elected," *id.,* at 397, the District Court concluded that there was "a present purpose to dilute the black vote . . . resulting from intentional state legislative *inaction. . . ."* *Id.,* at 398. Based on an "exhaustive analysis of the evidence in the record," the court held that "[t]he plaintiffs have met the burden cast in *White* and *Whitcomb,*" and that "the multi-member at-large election of Mobile City Commissioners . . . results in an unconstitutional dilution of black voting strength." *Id.,* at 402.

The Court of Appeals affirmed the District Court's judgment in one of four consolidated "dilution" cases decided on the same day. *Bolden* v. *Mobile,* 571 F. 2d 238 (CA5 1978); *Nevett* v. *Sides,* 571 F. 2d 209 (CA5 1978) (*Nevett II*); *Blacks United for Lasting Leadership, Inc.* v. *Shreveport,* 571

F. 2d 248 (CA5 1978); *Thomasville Branch of NAACP* v. *Thomas County, Georgia,* 571 F. 2d 257 (CA5 1978). In the lead case of *Nevett II, supra,* the Court of Appeals held that under *Washington* v. *Davis, supra,* and *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252 (1977), "a showing of racially motivated discrimination is a necessary element" for a successful claim of unconstitutional voting dilution under either the Fourteenth or Fifteenth Amendment. 571 F. 2d, at 219. The court concluded that the standards for proving unconstitutional voting dilution outlined in *White* v. *Regester* were consistent with the requirement that purposeful discrimination be shown because they focus on factors that go beyond a simple showing that minorities are not represented in proportion to their numbers in the general population. 571 F. 2d, at 219–220, n. 13, 222–224.

In its decision in the instant case the Court of Appeals reviewed the District Court's findings of fact, found them not to be clearly erroneous and held that they "compel the inference that [Mobile's at-large] system has been maintained with the purpose of diluting the black vote, thus supplying the element of intent necessary to establish a violation of the fourteenth amendment, *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.,* 429 U. S. 252 . . . (1977); *Washington* v. *Davis,* 426 U. S. 229 . . . (1976), and the fifteenth amendment, *Wright* v. *Rockefeller,* 376 U. S. 52 . . . (1964)." *Id.,* at 245. The court observed that the District Court's "finding that the legislature was acutely conscious of the racial consequences of its districting policies," coupled with the attempt to assign different functions to each of the three City Commissioners "to lock in the at-large feature of the scheme," constituted "direct evidence of the intent behind the maintenance of the at-large plan." *Id.,* at 246. The Court of Appeals concluded that "the district court has properly conducted the 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available' that a court must undertake in '[d]etermining whether invidious dis-

criminatory purpose was a motivating factor' in the maintenance or enactment of a districting plan." *Ibid.*, quoting *Arlington Heights* v. *Metropolitan Housing Dev. Corp., supra*, at 266.

### III

A plurality of the Court today agrees with the courts below that maintenance of Mobile's at-large system for election of City Commissioners violates the Fourteenth and Fifteenth Amendments only if it is motivated by a racially discriminatory purpose. The plurality also apparently reaffirms the vitality of *White* v. *Regester* and *Whitcomb* v. *Chavis,* which established the standards for determining whether at-large election systems are unconstitutionally discriminatory. The plurality nonetheless casts aside the meticulous application of the principles of these cases by both the District Court and the Court of Appeals by concluding that the evidence they relied upon "fell far short of showing" purposeful discrimination.

The plurality erroneously suggests that the District Court erred by considering the factors articulated by the Court of Appeals in *Zimmer* v. *McKeithen,* 485 F. 2d 1297 (CA5 1973), to determine whether purposeful discrimination has been shown. This remarkable suggestion ignores the facts that *Zimmer* articulated the very factors deemed relevant by *White* v. *Regester* and *Whitcomb* v. *Chavis*—a lack of minority access to the candidate selection process, unresponsiveness of elected officials to minority interests, a history of discrimination, majority vote requirements, provisions that candidates run for positions by place or number, the lack of any provision for at-large candidates to run from particular geographical subdistricts—and that both the District Court and the Court of Appeals considered these factors with the recognition that they are relevant only with respect to the question whether purposeful discrimination can be inferred.

Although the plurality does acknowledge that "the presence of the indicia relied on in *Zimmer* may afford some evidence

of a discriminatory purpose," it concludes that the evidence relied upon by the court below was "most assuredly insufficient to prove an unconstitutionally discriminatory purpose in the present case." The plurality apparently bases this conclusion on the fact that there are no official obstacles barring Negroes from registering, voting, and running for office, coupled with its conclusion that none of the factors relied upon by the courts below would alone be sufficient to support an inference of purposeful discrimination. The absence of official obstacles to registration, voting, and running for office heretofore has never been deemed to insulate an electoral system from attack under the Fourteenth and Fifteenth Amendments. In *White* v. *Regester,* 412 U. S. 755 (1973), there was no evidence that Negroes faced official obstacles to registration, voting, and running for office, yet we upheld a finding that they had been excluded from effective participation in the political process in violation of the Equal Protection Clause because a multi-member districting scheme, in the context of racial voting at the polls, was being used invidiously to prevent Negroes from being elected to public office. In *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960), and *Terry* v. *Adams,* 345 U. S. 461 (1953), we invalidated electoral systems under the Fifteenth Amendment not because they erected official obstacles in the path of Negroes registering, voting, or running for office, but because they were used effectively to deprive the Negro vote of any value. Thus, even though Mobile's Negro community may register and vote without hindrance, the system of at-large election of City Commissioners may violate the Fourteenth and Fifteenth Amendments if it is used purposefully to exclude Negroes from the political process.

In conducting "an intensely local appraisal of the design and impact" of the at-large election scheme, *White* v. *Regester, supra,* at 769, the District Court's decision was fully consistent with our recognition in *Washington* v. *Davis,* 426 U. S., at 242, that "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts,

including the fact, if it is true, that the law bears more heavily on one race than another." Although the totality of the facts relied upon by the District Court to support its inference of purposeful discrimination is even more compelling than that present in *White* v. *Regester,* the plurality today rejects the inference of purposeful discrimination apparently because each of the factors relied upon by the courts below is alone insufficient to support the inference. The plurality states that the "fact [that Negro candidates have been defeated] alone does not work a constitutional deprivation," that evidence of the unresponsiveness of elected officials "is relevant only as the most tenuous and circumstantial evidence," that "the substantial history of official racial discrimination . . . [is] of limited help," and that the features of the electoral system that enhance the disadvantages faced by a voting minority "are far from proof that the at-large electoral scheme represents purposeful discrimination." By viewing each of the factors relied upon below in isolation, and ignoring the fact that racial bloc voting at the polls makes it impossible to elect a black commissioner under the at-large system, the plurality rejects the "totality of the circumstances" approach we endorsed in *White* v. *Regester, supra,* at 766–770, *Washington* v. *Davis, supra,* at 241–242, and *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S., at 266, and leaves the courts below adrift on uncharted seas with respect to how to proceed on remand.

Because I believe that the findings of the District Court amply support an inference of purposeful discrimination in violation of the Fourteenth and Fifteenth Amendments, I respectfully dissent.

MR. JUSTICE MARSHALL, dissenting.*

The American ideal of political equality, conceived in the earliest days of our colonial existence and fostered by the

---

*[This opinion applies also to No. 78–357, *Williams et al.* v. *Brown et al., post,* p. 236.]

egalitarian language of the Declaration of Independence, could not forever tolerate the limitation of the right to vote to white propertied males. Our Constitution has been amended six times in the movement toward a democracy for more than the few,[1] and this Court has interpreted the Fourteenth Amendment to provide that "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction," *Dunn* v. *Blumstein,* 405 U. S. 330, 336 (1972). The Court's decision today is in a different spirit. Indeed, a plurality of the Court concludes that, in the absence of proof of intentional discrimination by the State, the right to vote provides the politically powerless with nothing more than the right to cast meaningless ballots.

The District Court in both of these cases found that the challenged multimember districting schemes unconstitutionally diluted the Negro vote. These factual findings were upheld by the Court of Appeals, and the plurality does not question them. Instead, the plurality concludes that districting schemes do not violate the Equal Protection Clause unless it is proved that they were enacted or maintained for the purpose of minimizing or canceling out the voting potential of a racial minority. The plurality would require plaintiffs in vote-dilution cases to meet the stringent burden of establishing discriminatory intent within the meaning of *Washington* v. *Davis,* 426 U. S. 229 (1976); *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252 (1977); and *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S. 256 (1979). In my view, our vote-dilution decisions require only a showing of discriminatory impact to justify the invalidation of a multimember districting scheme, and, because they are premised on the fundamental interest in voting protected by the Fourteenth Amendment, the discriminatory-impact standard adopted by them is unaffected by *Washington* v. *Davis, supra,* and its progeny. Furthermore, an intent re-

---

[1] U. S. Const., Amdts. 15, 17, 19, 23, 24, 26.

quirement is inconsistent with the protection against denial or abridgment of the vote on account of race embodied in the Fifteenth Amendment and in § 2 of the Voting Rights Act of 1965, 79 Stat. 437, as amended, 42 U. S. C. § 1973.[2] Even if, however, proof of discriminatory intent were necessary to support a vote-dilution claim, I would impose upon the plaintiffs a standard of proof less rigid than that provided by *Personnel Administrator of Mass.* v. *Feeney, supra.*

## I

The Court does not dispute the proposition that multimember districting can have the effect of submerging electoral minorities and overrepresenting electoral majorities.[3] It is

---

[2] I agree with the plurality, see *ante,* at 60–61, that the prohibition on denial or infringement of the right to vote contained in § 2 of the Voting Rights Act, 42 U. S. C. § 1973, contains the same standard as the Fifteenth Amendment. I disagree with the plurality's construction of that Amendment, however. See Part II, *infra.*

[3] The Court does not quarrel with the generalization that in many instances an electoral minority will fare worse under multimember districting than under single-member districting. Multimember districting greatly enhances the opportunity of the majority political faction to elect all representatives of the district. In contrast, if the multimember district is divided into several single-member districts, an electoral minority will have a better chance to elect a candidate of its choice, or at least to exert greater political influence. It is obvious that the greater the degree to which the electoral minority is homogeneous and insular and the greater the degree that bloc voting occurs along majority-minority lines, the greater will be the extent to which the minority's voting power is diluted by multimember districting. See E. Banfield & J. Wilson, City Politics 91–96, 303–308 (1963); R. Dixon, Jr., Democratic Representation 12, 476–484, 503–527 (1968); Bonapfel, Minority Challenges to At-Large Elections: The Dilution Problem, 10 Ga. L. Rev. 353, 358–360 (1976); Derfner, Racial Discrimination and the Right to Vote, 26 Vand. L. Rev. 523, 553–555 (1973); Comment, Effective Representation and Multimember Districts, 68 Mich. L. Rev. 1577, 1577–1579 (1970). Recent empirical studies have documented the validity of this generalization. See Berry & Dye, The Discriminatory Effects of At-Large Elections, 7 Fla. St. U. L. Rev. 85, 113–122 (1979); Jones, The Impact of Local Election Systems on Black

for this reason that we developed a strong preference for single-member districting in court-ordered reapportionment plans. See *ante,* at 66, n. 12. Furthermore, and more important for present purposes, we decided a series of vote-dilution cases under the Fourteenth Amendment that were designed to protect electoral minorities from precisely the combination of electoral laws and historical and social factors found in the present cases.[4] In my view, the plurality's treatment of

Political Representation, 11 Urb. Aff. Q. 345 (1976); Karnig, Black Resources and City Council Representation, 41 J. Pol. 134 (1979); Karnig, Black Representation on City Councils: The Impact of District Elections and Socioeconomic Factors, 12 Urb. Aff. Q. 223 (1976); Sloan, "Good Government" and the Politics of Race, 17 Soc. Prob. 161 (1969); The Impact of Municipal Reformism: A Symposium, 59 Soc. Sci. Q. 117 (1978).

The electoral schemes in these cases involve majority-vote, numbered-post, and staggered-term requirements. See *Bolden* v. *City of Mobile,* 423 F. Supp. 384, 386–387 (SD Ala. 1976); *Brown* v. *Moore,* 428 F. Supp. 1123, 1126–1127 (SD Ala. 1976). These electoral rules exacerbate the vote-dilutive effects of multimember districting. A requirement that a candidate must win by a majority of the vote forces a minority candidate who wins a plurality of votes in the general election to engage in a runoff election with his nearest competitor. If the competitor is a member of the dominant political faction, the minority candidate stands little chance of winning in the second election. A requirement that each candidate must run for a particular "place" or "post" creates head-to-head contests that minority candidates cannot survive. When a number of positions on a governmental body are to be chosen in the same election, members of a minority will increase the likelihood of election of a favorite candidate by voting only for him. If the remainder of the electorate splits its votes among the other candidates, the minority's candidate might well be elected by the minority's "single-shot voting." If the terms of the officeholders are staggered, the opportunity for single-shot voting is decreased. See *City of Rome* v. *United States, post,* p. 156; *Zimmer* v. *McKeithen,* 485 F. 2d 1297, 1305 (CA5 1973) (en banc), aff'd on other grounds *sub nom. East Carroll Parish School Bd.* v. *Marshall,* 424 U. S. 636 (1976) *(per curiam);* Bonapfel, *supra;* Derfner, *supra.*

[4] The plurality notes that at-large elections were instituted in cities as a reform measure to correct corruption and inefficiency in municipal government, and suggests that it "may be a rash assumption" to apply vote-dilu-

these cases is fanciful. Although we have held that multi-member districts are not unconstitutional *per se,* see *ante,* at 66, there is simply no basis for the plurality's conclusion that

tion concepts to a municipal government elected in that fashion. See *ante,* at 70, and n. 15. To the contrary, local governments are not exempt from the constitutional requirement to adopt representational districting ensuring that the votes of each citizen will have equal weight. *Avery* v. *Midland County,* 390 U. S. 474 (1968). Indeed, in *Beer* v. *United States,* 425 U. S. 130, 142, n. 14 (1976), and *Abate* v. *Mundt,* 403 U. S. 182, 184, n. 2 (1971), we assumed that our vote-dilution doctrine applied to local governments.

Furthermore, though municipalities must be accorded some discretion in arranging their affairs, see *Abate* v. *Mundt, supra,* there is all the more reason to scrutinize assertions that municipal, rather than state, multi-member districting dilutes the vote of an electoral minority:

"In statewide elections, it is possible that a large minority group in one multi-member district will be unable to elect any legislators, while in another multi-member district where the same group is a slight majority, they will elect the entire slate of legislators. Thus, the multi-member electoral system may hinder a group in one district but prove an advantage in another. In at-large elections in cities this is not possible. There is no way to balance out the discrimination against a particular minority group because the entire city is one huge election district. The minority's loss is absolute." Berry & Dye, *supra* n. 3, at 87.

That at-large elections were instituted as part of a "reform" movement in no way ameliorates these harsh effects. Moreover, in some instances the efficiency and breadth of perspective supposedly resulting from a reform structure of municipal government are achieved at a high cost. In a white-majority city in which severe racial bloc voting is common, the citywide view allegedly inculcated in city commissioners by at-large elections need not extend beyond the white community, and the efficiency of the commission form of government can be achieved simply by ignoring the concerns of the powerless minority.

It would be a mistake, then, to conclude that municipal at-large elections provide an inherently superior representational scheme. See also n. 3, *supra; Chapman* v. *Meier,* 372 F. Supp. 371, 388–392 (ND 1974) (three-judge court) (Bright, J., dissenting), rev'd, 420 U. S. 1 (1975). It goes without saying that a municipality has the freedom to design its own governance system. When that system is subjected to constitutional attack, however, the question is whether it was enacted or maintained with

under our prior cases proof of discriminatory intent is a necessary condition for the invalidation of multimember districting.

### A

In *Fortson* v. *Dorsey*, 379 U. S. 433 (1965), the first vote-dilution case to reach this Court, we stated explicitly that such a claim could rest on either discriminatory purpose or effect:

> "It might well be that, *designedly or otherwise,* a multi-member constituency apportionment scheme, under the circumstances of a particular case, would *operate* to minimize or cancel out the voting strength of racial or political elements of the voting population." *Id.*, at 439 (emphasis added).

We reiterated these words in *Burns* v. *Richardson*, 384 U. S. 73 (1966), interpreted them as the correct test to apply to vote-dilution claims, and described the standard as one involving "invidious effect," *id.*, at 88. We then held that the plaintiffs had failed to meet their burden of proof:

> "[T]he demonstration that a particular multi-member scheme *effects an invidious result* must appear from evidence in the record. . . . That demonstration was not made here. In relying on conjecture as to the effects of multi-member districting rather than demonstrated fact, the court acted in a manner more appropriate to the body responsible for drawing up the districting plan. Speculations do not supply evidence that the multi-member districting *was designed to have or had* the invidious effect necessary to a judgment of the unconstitutionality of the districting." *Id.*, at 88–89 (emphasis added) (footnote omitted).

It could not be plainer that the Court in *Burns* considered

---

a discriminatory purpose or.has a discriminatory effect, not whether it comports with one or another of the competing notions about "good government."

discriminatory effect a sufficient condition for invalidating a multimember districting plan.

In *Whitcomb* v. *Chavis*, 403 U. S. 124 (1971), we again repeated and applied the *Fortson* standard, 403 U. S., at 143, 144, but determined that the Negro community's lack of success at the polls was the result of partisan politics, not racial vote dilution. *Id.*, at 150–155. The Court stressed that both the Democratic and Republican Parties had nominated Negroes, and several had been elected. Negro candidates lost only when their entire party slate went down to defeat. *Id.*, at 150, nn. 29–30, 152–153. In addition, the Court was impressed that there was no finding that officials had been unresponsive to Negro concerns. *Id.*, at 152, n. 32, 155.[5]

More recently, in *White* v. *Regester*, 412 U. S. 755 (1973), we invalidated the challenged multimember districting plans because their characteristics, when combined with historical and social factors, had the discriminatory effect of denying

---

[5] As the plurality notes, see *ante*, at 66, we indicated in *Whitcomb* v. *Chavis*, 403 U. S., at 149, that multimember districts were unconstitutional if they were "conceived or operated as purposeful devices to further racial or economic discrimination." The Court in *Whitcomb* did not, however, suggest that discriminatory purpose was a necessary condition for the invalidation of multimember districting. Our decision in *Whitcomb, supra*, at 143, acknowledged the continuing validity of the discriminatory-impact test adopted in *Fortson* v. *Dorsey*, 379 U. S. 433, 439 (1965), and restated it as requiring plaintiffs to prove that "multi-member districts unconstitutionally *operate* to dilute or cancel the voting strength of racial or political elements." *Whitcomb, supra*, at 144 (emphasis added).

*Abate* v. *Mundt, supra*, decided the same day as *Whitcomb*, provides further evidence that *Whitcomb* did not alter the discriminatory-effects standard developed in earlier cases. In *Abate, supra*, at 184, n. 2, we rejected the argument that a multimember districting scheme had a vote-dilutive effect because "[p]etitioners . . . have not shown that these multimember districts, by themselves, operate to impair the voting strength of particular racial or political elements , . . , see *Burns* v. *Richardson*, 384 U. S. 73, 88 (1966)."

the plaintiff Negroes and Mexican-Americans equal access to the political process. *Id.*, at 765–770. We stated that

"it is not enough that the racial group allegedly discriminated against has not had legislative seats in proportion to its voting potential. The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." *Id.*, at 765–766.

We held that the three-judge District Court had properly applied this standard in invalidating the multimember districting schemes in the Texas counties of Dallas and Bexar. The District Court had determined that the characteristics of the challenged electoral systems—multimember districts, a majority-vote requirement for nomination in a primary election, and a rule mandating that a candidate running for a position in a multimember district must run for a specified "place" on the ticket—though "neither in themselves improper nor invidious," reduced the electoral influence of Negroes and Mexican-Americans. *Id.*, at 766.[6] The District Court identified a number of social and historical factors that, when combined with the Texas electoral structure, resulted in vote dilution: (1) a history of official racial discrimination in Texas, including discrimination inhibiting the registration, casting of ballots, and political participation of Negroes; (2) proof that minorities were still suffering the effects of past discrimination; (3) a history of gross underrepresentation of minority interests; (4) proof of official insensitivity to the needs of minority citizens, whose votes were not needed by those in power; (5) the recent use of racial campaign tactics; and (6) a cultural and language barrier inhibiting the participation of

---

[6] See n. 3, *supra.*

Mexican-Americans. *Id.*, at 766–770. Based "on the totality of the circumstances," we affirmed the District Court's conclusion that the use of multimember districts excluded the plaintiffs "from effective participation in political life." *Id.*, at 769.[7]

---

[7] *White* v. *Regester,* makes clear the distinction between the concepts of vote dilution and proportional representation. We have held that, in order to prove an allegation of vote dilution, the plaintiffs must show more than simply that they have been unable to elect candidates of their choice. See 412 U. S., at 765–766; *Whitcomb* v. *Chavis, supra,* at 149–150, 153. The Constitution, therefore, does not contain any requirement of proportional representation. Cf. *United Jewish Organizations* v. *Carey,* 430 U. S. 144 (1977); *Gaffney* v. *Cummings,* 412 U. S. 735 (1973). When all that is proved is mere lack of success at the polls, the Court will not presume that members of a political minority have suffered an impermissible dilution of political power. Rather, it is assumed that these persons have means available to them through which they can have some effect on governmental decisionmaking. For example, many of these persons might belong to a variety of other political, social, and economic groups that have some impact on officials. In the absence of evidence to the contrary, it may be assumed that officials will not be improperly influenced by such factors as the race or place of residence of persons seeking governmental action. Furthermore, political factions out of office often serve as watchdogs on the performance of the government, bind together into coalitions having enhanced influence, and have the respectability necessary to affect public policy.

Unconstitutional vote dilution occurs only when a discrete political minority whose voting strength is diminished by a districting scheme proves that historical and social factors render it largely incapable of effectively utilizing alternative avenues of influencing public policy. See n. 19, *infra.* In these circumstances, the only means of breaking down the barriers encasing the political arena is to structure the electoral districting so that the minority has a fair opportunity to elect candidates of its choice.

The test for unconstitutional vote dilution, then, looks only to the discriminatory effects of the combination of an electoral structure and historical and social factors. At the same time, it requires electoral minorities to prove far more than mere lack of success at the polls.

We have also spoken of dilution of voting power in cases arising under the Voting Rights Act of 1965, 42 U. S. C. § 1973 *et seq.* Under § 5 of

It is apparent that a showing of discriminatory intent in the creation or maintenance of multimember districts is as unnecessary after *White* as it was under our earlier vote-dilution decisions. Under this line of cases, an electoral districting plan is invalid if it has the effect of affording an electoral minority "less opportunity than . . . other residents in the district to participate in the political processes and to elect legislators of their choice," *id.,* at 766. It is also apparent that the Court in *White* considered equal access to the political process as meaning more than merely allowing the minority the opportunity to vote. *White* stands for the proposition that an electoral system may not relegate an electoral minority to political impotence by diminishing the importance of its vote. The plurality's approach requiring proof of discriminatory purpose in the present cases is, then, squarely contrary to *White* and its predecessors.[8]

## B

The plurality fails to apply the discriminatory-effect standard of *White* v. *Regester* because that approach conflicts with what the plurality takes to be an elementary principle of law. "[O]nly if there is purposeful discrimination," announces the

---

that Act, 42 U. S. C. § 1973c, a state or local government covered by the Act may not enact new electoral procedures having the purpose or effect of denying or abridging the right to vote on account of race or color. We have interpreted this provision as prohibiting *any* retrogression in Negro voting power. *Beer* v. *United States,* 425 U. S. 130, 141 (1976). In some cases, we have labeled such retrogression a "dilution" of the minority vote. See, *e. g., City of Rome* v. *United States, post,* p. 156. Vote dilution under § 5, then, involves a standard different from that applied in cases such as *White* v. *Regester, supra,* in which diminution of the vote violating the Fourteenth or Fifteenth Amendment is alleged.

[8] The plurality's approach is also inconsistent with our statement in *Dallas County* v. *Reese,* 421 U. S. 477, 480 (1975) (*per curiam*), that multimember districting violates the Equal Protection Clause if it "in fact operates impermissibly to dilute the voting strength of an identifiable element of the voting population." See also *Chapman* v. *Meier,* 420 U. S., at 17.

plurality, "can there be a violation of the Equal Protection Clause of the Fourteenth Amendment." *Ante*, at 66. That proposition is plainly overbroad. It fails to distinguish between two distinct lines of equal protection decisions: those involving suspect classifications, and those involving fundamental rights.

We have long recognized that under the Equal Protection Clause classifications based on race are "constitutionally suspect," *Bolling* v. *Sharpe*, 347 U. S. 497, 499 (1954), and are subject to the "most rigid scrutiny," *Korematsu* v. *United States*, 323 U. S. 214, 216 (1944), regardless of whether they infringe on an independently protected constitutional right. Cf. *University of California Regents* v. *Bakke*, 438 U. S. 265 (1978). Under *Washington* v. *Davis*, 426 U. S. 229 (1976), a showing of discriminatory purpose is necessary to impose strict scrutiny on facially neutral classifications having a racially discriminatory impact. Perhaps because the plaintiffs in the present cases are Negro, the plurality assumes that their vote-dilution claims are premised on the suspect-classification branch of our equal protection cases, and that under *Washington* v. *Davis, supra,* they are required to prove discriminatory intent. That assumption fails to recognize that our vote-dilution decisions are rooted in a different strand of equal protection jurisprudence.

Under the Equal Protection Clause, if a classification "impinges upon a fundamental right explicitly or implicitly protected by the Constitution, . . . strict judicial scrutiny" is required, *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 17 (1973), regardless of whether the infringement was intentional.[9] As I will explain, our cases

---

[9] See *Shapiro* v. *Thompson,* 394 U. S. 618 (1969) (right to travel); *Reynolds* v. *Sims,* 377 U. S. 533 (1964) (right to vote); *Douglas* v. *California,* 372 U. S. 353 (1963); and *Griffin* v. *Illinois,* 351 U. S. 12 (1956) (right to fair access to criminal process). Under the rubric of the fundamental right of privacy, we have recognized that individuals have freedom from unjustified governmental interference with personal decisions involv-

recognize a fundamental right to equal electoral participation that encompasses protection against vote dilution. Proof of discriminatory purpose is, therefore, not required to support a claim of vote dilution.[10] The plurality's erroneous conclusion to the contrary is the result of a failure to recognize the central distinction between *White* v. *Regester*, 412 U. S. 755 (1973), and *Washington* v. *Davis, supra:* the former involved an infringement of a constitutionally protected right, while the latter dealt with a claim of racially discriminatory distribution of an interest to which no citizen has a constitutional entitlement.[11]

---

ing marriage, *Zablocki* v. *Redhail,* 434 U. S. 374 (1978); *Loving* v. *Virginia,* 388 U. S. 1 (1967); procreation, *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535 (1942); contraception, *Carey* v. *Population Services International,* 431 U. S. 678 (1977); *Eisenstadt* v. *Baird,* 405 U. S. 438 (1972); *Griswold* v. *Connecticut,* 381 U. S. 479 (1965); abortion, *Roe* v. *Wade,* 410 U. S. 113 (1973); family relationships, *Prince* v. *Massachusetts,* 321 U. S. 158 (1944); and child rearing and education, *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925); *Meyer* v. *Nebraska,* 262 U. S. 390 (1923). See also *Moore* v. *East Cleveland,* 431 U. S. 494 (1977).

[10] As the present cases illustrate, a requirement of proof of discriminatory intent seriously jeopardizes the free exercise of the fundamental right to vote. Although the right to vote is indistinguishable for present purposes from the other fundamental rights our cases have recognized, see n. 9, *supra,* surely the plurality would not require proof of discriminatory purpose in those cases. The plurality fails to articulate why the right to vote should receive such singular treatment. Furthermore, the plurality refuses to recognize the disutility of requiring proof of discriminatory purpose in fundamental rights cases. For example, it would make no sense to require such a showing when the question is whether a state statute regulating abortion violates the right of personal choice recognized in *Roe* v. *Wade, supra.* The only logical inquiry is whether, regardless of the legislature's motive, the statute has the effect of infringing that right. See, *e. g., Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52 (1976).

[11] Judge Wisdom of the Court of Appeals below recognized this distinction in a companion case, see *Nevett* v. *Sides,* 571 F. 2d 209, 231–234 (CA5 1978) (specially concurring opinion). See also Comment, Proof of

Nearly a century ago, the Court recognized the elementary proposition upon which our structure of civil rights is based: "[T]he political franchise of voting is . . . a fundamental political right, because preservative of all rights." *Yick Wo* v. *Hopkins,* 118 U. S. 356, 370 (1886). We reiterated that theme in our landmark decision in *Reynolds* v. *Sims,* 377 U. S. 533, 561–562 (1964), and stated that, because "the right of suffrage is a fundamental matter in a free and democratic society[,] . . . any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Ibid.* We realized that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.,* at 555. Accordingly, we recognized that the Equal Protection Clause protects "[t]he right of a citizen to equal representation and to have his vote weighted equally with those of all other citizens." *Id.,* at 576. See also *Wes-*

---

Racially Discriminatory Purpose Under the Equal Protection Clause: *Washington* v. *Davis, Arlington Heights, Mt. Healthy,* and *Williamsburgh,* 12 Harv. Civ. Rights-Civ. Lib. L. Rev. 725, 758, n. 175 (1977); Note, Racial Vote Dilution in Multimember Districts: The Constitutional Standard After *Washington* v. *Davis,* 76 Mich. L. Rev. 694, 722–726 (1978); Comment, Constitutional Challenges to Gerrymanders, 45 U. Chi. L. Rev. 845, 869–877 (1978).

*Washington* v. *Davis,* 426 U. S. 229 (1976), involved alleged racial discrimination in public employment. By describing interests such as public employment as constitutional gratuities, I do not, of course, mean to suggest that their deprivation is immune from constitutional scrutiny. Indeed, our decisions have referred to the importance of employment, see *Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 116 (1976); *Meyer* v. *Nebraska, supra,* at 399; *Truax* v. *Raich,* 239 U. S. 33, 41 (1915), and we have explicitly recognized that in some circumstances public employment falls within the categories of liberty and property protected by the Fifth and Fourteenth Amendments, see, *e. g., Arnett* v. *Kennedy,* 416 U. S. 134 (1974); *Perry* v. *Sindermann,* 408 U. S. 593 (1972). The Court has not held, however, that a citizen has a constitutional right to public employment.

*berry* v. *Sanders,* 376 U. S. 1, 17 (1964); *Gray* v. *Sanders,* 372 U. S. 368, 379–380 (1963).[12]

*Reynolds* v. *Sims* and its progeny [13] focused solely on the discriminatory *effects* of malapportionment. They recognize that, when population figures for the representational districts of a legislature are not similar, the votes of citizens in larger districts do not carry as much weight in the legislature as do votes cast by citizens in smaller districts. The equal protection problem attacked by the "one person, one vote" principle is, then, one of vote dilution: under *Reynolds,* each citizen must have an "equally effective voice" in the election of representatives. *Reynolds* v. *Sims, supra,* at 565. In the present cases, the alleged vote dilution, though caused by the combined effects of the electoral structure and social and historical factors rather than by unequal population distribution, is analytically the same concept: the unjustified abridgment of a fundamental right.[14] It follows, then, that a showing of dis-

---

[12] We have not, however, held that the Fourteenth Amendment contains an absolute right to vote. As we explained in *Dunn* v. *Blumstein,* 405 U. S. 330 (1972):

"In decision after decision, this Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction. [Citing cases.] This 'equal right to vote' . . . is not absolute; the States have the power to impose voter qualifications, and to regulate access to the franchise in other ways. . . . But, as a general matter, 'before that right [to vote] can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny.'" *Id.,* at 336 (quoting *Evans* v. *Cornman,* 398 U. S. 419, 426, 422 (1970)).

[13] *Avery* v. *Midland County,* 390 U. S. 474 (1968), applied the equal-representation standard of *Reynolds* v. *Sims* to local governments. See also, *e. g., Connor* v. *Finch,* 431 U. S. 407 (1977); *Lockport* v. *Citizens for Community Action,* 430 U. S. 259 (1977); *Hadley* v. *Junior College Dist.,* 397 U. S. 50 (1970).

[14] In attempting to limit *Reynolds* v. *Sims* to its facts, see *ante,* at 77–79, the plurality confuses the nature of the constitutional right recognized in that decision with the means by which that right can be violated. *Reynolds* held that under the Equal Protection Clause each citizen must

criminatory intent is just as unnecessary under the vote-dilution approach adopted in *Fortson* v. *Dorsey*, 379 U. S. 433 (1965), and applied in *White* v. *Regester, supra*, as it is under our reapportionment cases.[15]

---

be accorded an essentially equal voice in the election of representatives. The Court determined that unequal population distribution in a multi-district representational scheme was one readily ascertainable means by which this right was abridged. The Court certainly did not suggest, however, that violations of the right to effective political participation mattered only if they were caused by malapportionment. The plurality's assertion to the contrary in this case apparently would require it to read *Reynolds* as recognizing fair apportionment as an end in itself, rather than as simply a means to protect against vote dilution.

[15] Proof of discriminatory purpose has been equally unnecessary in our decisions assessing whether various impediments to electoral participation are inconsistent with the fundamental interest in voting. In the seminal case, *Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663 (1966), we invalidated a $1.50 poll tax imposed as a precondition to voting. Relying on our decision two years earlier in *Reynolds* v. *Sims*, see *Harper, supra*, at 667–668, 670, we determined that "the right to vote is too precious, too fundamental to be so burdened or conditioned," 383 U. S., at 670. We analyzed the right to vote under the familiar standard that "where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined." *Ibid.* In accord with *Harper*, we have applied heightened scrutiny in assessing the imposition of filing fees, *e. g., Lubin* v. *Panish*, 415 U. S. 709 (1974); limitations on who may participate in elections involving specialized governmental entities, *e. g., Kramer* v. *Union School District*, 395 U. S. 621 (1969); durational residency requirements, *e. g., Dunn* v. *Blumstein, supra;* enrollment time limitations for voting in party primary elections, *e. g., Kusper* v. *Pontikes*, 414 U. S. 51 (1973); and restrictions on candidate access to the ballot, *e. g., Illinois Elections Bd.* v. *Socialist Workers Party*, 440 U. S. 173 (1979).

To be sure, we have approved some limitations on the right to vote. Compare, *e. g., Salyer Land Co.* v. *Tulare Water District*, 410 U. S. 719 (1973), with *Kramer* v. *Union School District, supra*. We have never, however, required a showing of discriminatory purpose to support a claim of infringement of this fundamental interest. To the contrary, the Court

Indeed, our vote-dilution cases have explicitly acknowledged that they are premised on the infringement of a fundamental right, not on the Equal Protection Clause's prohibition of racial discrimination. Our first vote-dilution decision, *Fortson* v. *Dorsey, supra,* involved a 1962 Georgia reapportionment statute that allocated the 54 seats of the Georgia Senate among the State's 159 counties. Thirty-three of the senatorial districts were made up of from one to eight counties each, and were single-member districts. The remaining 21 districts were allotted among the 7 most populous counties, with each county containing at least 2 districts and electing all of its senators by countywide vote. The plaintiffs, who were registered voters residing in two of the multi-district counties,[16] argued that the apportionment plan on its face violated the Equal Protection Clause because countywide voting in the seven multidistrict counties denied their residents a vote equal to that of voters residing in single-member con-

---

has accepted at face value the purposes articulated for a qualification of this right, and has invalidated such a limitation under the Equal Protection Clause only if its purpose either lacked sufficient substantiality when compared to the individual interests affected or could have been achieved by less restrictive means. See, *e. g., Dunn* v. *Blumstein, supra,* at 335, 337, 343–360.

The approach adopted in this line of cases has been synthesized with the one-person, one-vote doctrine of *Reynolds* v. *Sims* in the following fashion: "It has been established in recent years that the Equal Protection Clause confers the substantive right to participate on an equal basis with other qualified voters whenever the State has adopted an electoral process for determining who will represent any segment of the State's population." *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 59, n. 2 (1973) (STEWART, J., concurring) (citing *Reynolds* v. *Sims,* 377 U. S. 533 (1964); *Kramer* v. *Union School District, supra; Dunn* v. *Blumstein, supra*). It is plain that this standard requires no showing of discriminatory purpose to trigger strict scrutiny of state interference with the right to vote.

[16] See *Dorsey* v. *Fortson,* 228 F. Supp. 259, 261 (ND Ga. 1964) (three-judge court), rev'd, 379 U. S. 433 (1965).

stituencies.[17]   We were unconvinced that the plan operated to dilute any Georgian's vote, and therefore upheld the facial validity of the scheme.  We cautioned, however, that the Equal Protection Clause would not tolerate a multimember districting plan that "designedly or otherwise, . . . operate[d] to minimize or cancel out the voting strength of racial or *political* ·elements of the voting population." 379 U. S., at 439 (emphasis added).

The approach to vote dilution adopted in *Fortson* plainly consisted of a fundamental-rights analysis.  If the Court had believed that the equal protection problem with alleged vote dilution was one of racial discrimination and not abridgment of the right to vote, it would not have accorded standing to the plaintiffs, who were simply registered voters of Georgia alleging that the state apportionment plan, as a theoretical matter, diluted their voting strength because of where they lived.  To the contrary, we did not question their standing, and held against them solely because we found unpersuasive their claim on the merits.  The Court did not reach this result by inadvertence; rather, we explicitly recognized that we had adopted a fundamental-rights approach when we stated that the Equal Protection Clause protected the voting strength of political as well as racial groups.

Until today, this Court had never deviated from this principle.  We reiterated that our vote-dilution doctrine protects political groups in addition to racial groups in *Burns* v. *Richardson,* 384 U. S., at 88, where we allowed a general class of qualified voters to assert such a vote-dilution claim.   In *Whitcomb* v. *Chavis,* 403 U. S. 124 (1971), we again explicitly recognized that political groups could raise such claims, *id.,* at 143, 144.   In *White* v. *Regester,* 412 U. S. 755 (1973),

---

[17] Specifically, the plaintiffs contended that countywide voting in the multidistrict counties could, as a matter of mathematics, result in the nullification of the unanimous choice of the voters of one district.  *Fortson* v. *Dorsey,* 379 U. S., at 436–437.

the plaintiffs were Negroes and Mexican-Americans, and accordingly the Court had no reason to discuss whether non-minority plaintiffs could assert claims of vote dilution.[18]   In a companion case to *White,* however, we again recognized that "political elements" were protected against vote dilution. *Gaffney* v. *Cummings,* 412 U. S. 735, 751 (1973).   Two years later, in *Dallas County* v. *Reese,* 421 U. S. 477 (1975) (*per curiam*), we accorded standing to urban dwellers alleging vote dilution as to the election of the county commission and stated that multimember districting is unconstitutional if it "in fact operates impermissibly to dilute the voting strength of an *identifiable element* of the voting population." *Id.,* at 480 (emphasis added).   And in *United Jewish Organizations* v. *Carey,* 430 U. S. 144 (1977), the plurality opinion of MR. JUSTICE WHITE stated that districting plans were subject to attack if they diluted the vote of *"racial or political groups." Id.,* at 167 (emphasis in original).[19]

Our vote-dilution decisions, then, involve the fundamental-interest branch, rather than the antidiscrimination branch, of our jurisprudence under the Equal Protection Clause.   They recognize a substantive constitutional right to participate on an equal basis in the electoral process that cannot be denied or diminished for any reason, racial or otherwise, lacking quite substantial justification.   They are premised on a rationale wholly apart from that underlying *Washington* v. *Davis,* 426 U. S. 229 (1976).   That decision involved application of a different equal protection principle, the prohibition on racial discrimination in the governmental distribution of interests

---

[18] The same is true of our most recent case discussing vote dilution, *Wise* v. *Lipscomb,* 437 U. S. 535 (1978).

[19] In contrast to a racial group, however, a political group will bear a rather substantial burden of showing that it is sufficiently discrete to suffer vote dilution.   See *Dallas County* v. *Reese,* 421 U. S. 477 (1975) (*per curiam*) (allowing city dwellers to attack a countywide multimember district).   See generally Comment, Effective Representation and Multimember Districts, 68 Mich. L. Rev. 1577, 1594–1596 (1970).

to which citizens have no constitutional entitlement.[20] Whatever may be the merits of applying motivational analysis to the allocation of constitutionally gratuitous benefits, that approach is completely misplaced where, as here, it is applied to the distribution of a constitutionally protected interest.[21]

---

[20] The dispute in *Washington* v. *Davis* concerned alleged racial discrimination in public employment, an interest to which no one has a constitutional right, see n. 11, *supra*. In that decision, the Court held only that "the invidious quality of a law *claimed to be racially discriminatory* must ultimately be traced to a racially discriminatory purpose." 426 U. S., at 240 (emphasis added). The Court's decisions following *Washington* v. *Davis* have also involved alleged discrimination in the allocation of interests falling short of constitutional rights. *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256 (1979) (alleged sex discrimination in public employment); *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252 (1977) (alleged racial discrimination in zoning). As explained in *Feeney, supra*, "[w]hen some other independent right is not at stake . . . and when there is no 'reason to infer antipathy,' . . . it is presumed that 'even improvident decisions will eventually be rectified by the democratic process.'" 442 U. S., at 272 (quoting *Vance* v. *Bradley*, 440 U. S. 93, 97 (1979)).

[21] Professor Ely has recognized this distinction:

"The danger I see is . . . that the Court, in its newfound enthusiasm for motivation analysis, will seek to export it to fields where it has no business. It therefore cannot be emphasized too strongly that analysis of motivation is appropriate only to claims of improper discrimination in the distribution of goods that are constitutionally gratuitous (that is, benefits to which people are not entitled as a matter of substantive constitutional right). . . . However, *where what is denied is something to which the complainant has a substantive constitutional right*—either because it is granted by the terms of the Constitution, or because it is essential to the effective functioning of a democratic government—*the reasons it was denied are irrelevant*. It may become important in court what justifications counsel for the state can *articulate* in support of its denial or nonprovision, but the reasons that actually inspired the denial never can: To have a right to something is to have a claim on it irrespective of why it is denied. It would be a tragedy of the first order were the Court to expand its burgeoning awareness of the relevance of motivation into the thoroughly mistaken notion that a denial of a constitutional right does not count as such unless it was intentional." Ely, The Centrality and Limits of Motivation Anal-

*Washington* v. *Davis,* then, in no way alters the discriminatory-impact test developed in *Fortson* v. *Dorsey,* 379 U. S. 433 (1965), and applied in *White* v. *Regester, supra,* to evaluate claims of dilution of the fundamental right to vote. In my view, that test is now, and always has been, the proper method of safeguarding against inequitable distribution of political influence.

The plurality's response is that my approach amounts to nothing less than a constitutional requirement of proportional representation for groups. See *ante,* at 75–80. That assertion amounts to nothing more than a red herring: I explicitly reject the notion that the Constitution contains any such requirement. See n. 7, *supra.* The constitutional protection against vote dilution found in our prior cases does not extend to those situations in which a group has merely failed to elect representatives in proportion to its share of the population. To prove unconstitutional vote dilution, the group is also required to carry the far more onerous burden of demonstrating that it has been effectively fenced out of the political process. See *ibid.* Typical of the plurality's mischaracterization of my position is its assertion that I would provide protection against vote dilution for "every 'political group,' or at least every such group that is in the minority." *Ante,* at 75. The vote-dilution doctrine can logically apply only to groups whose electoral discreteness and insularity allow dominant political factions to ignore them. See nn. 7 and 19, *supra.* In short, the distinction between a requirement of proportional representation and the discriminatory-effect test I espouse is by no means a difficult one, and it is hard for me to understand why the plurality insists on ignoring it.

The plaintiffs in No. 77–1844 proved that no Negro had ever been elected to the Mobile City Commission, despite the fact that Negroes constitute about one-third of the electorate, and that the persistence of severe racial bloc voting made it highly

ysis, 15 San Diego L. Rev. 1155, 1160–1161 (1978) (emphasis in original) (footnotes omitted).

unlikely that any Negro could be elected at large in the foreseeable future. 423 F. Supp. 384, 387–389 (SD Ala. 1976). Contrary to the plurality's contention, see *ante*, at 75–76, however, I do not find unconstitutional vote dilution in this case simply because of that showing. The plaintiffs convinced the District Court that Mobile Negroes were unable to use alternative avenues of political influence. They showed that Mobile Negroes still suffered pervasive present effects of massive historical official and private discrimination, and that the City Commission had been quite unresponsive to the needs of the minority community. The City of Mobile has been guilty of such pervasive racial discrimination in hiring employees that extensive intervention by the Federal District Court has been required. 423 F. Supp., at 389, 400. Negroes are grossly underrepresented on city boards and committees. *Id.*, at 389–390. The city's distribution of public services is racially discriminatory. *Id.*, at 390–391. City officials and police were largely unmoved by Negro complaints about police brutality and a "mock lynching." *Id.*, at 392. The District Court concluded that "[t]his sluggish and timid response is another manifestation of the low priority given to the needs of the black citizens and of the [commissioners'] political fear of a white backlash vote when black citizens' needs are at stake." *Ibid.* See also the dissenting opinion of my Brother WHITE, *ante*, p. 94.

A requirement of proportional representation would indeed transform this Court into a "super-legislature," *ante*, at 76, and would create the risk that some groups would receive an undeserved windfall of political influence. In contrast, the protection against vote dilution recognized by our prior cases serves as a minimally intrusive guarantee of political survival for a discrete political minority that is effectively locked out of governmental decisionmaking processes.[22] So under-

---

[22] It is at this point that my view most diverges from the position expressed by my Brother STEVENS, *ante*, p. 83. He would strictly scrutinize

stood, the doctrine hardly " 'create[s] substantive constitutional rights in the name of guaranteeing equal protection of the laws,' " *ibid.*, quoting *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S., at 33. Rather, the doctrine is a simple reflection of the basic principle that the Equal Protection Clause protects "[t]he right of a citizen to equal representation and to have his vote weighted equally with those of all other citizens." *Reynolds* v. *Sims*, 377 U. S., at 576.[23]

---

state action having an adverse impact on an individual's right to vote. In contrast, he would apply a less stringent standard to state action diluting the political influence of a group. See *ante*, at 83–85. The facts of the present cases, however, demonstrate that severe and persistent racial bloc voting, when coupled with the inability of the minority effectively to participate in the political arena by alternative means, can effectively disable the individual Negro as well as the minority community as a whole. In these circumstances, MR. JUSTICE STEVENS' distinction between the rights of individuals and the political strength of groups becomes illusory.

[23] The foregoing disposes of any contention that, merely by citing *Wright* v. *Rockefeller*, 376 U. S. 52 (1964), the Court in *Washington* v. *Davis*, 426 U. S., at 240, and *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S., at 264, intended to bring vote-dilution cases within the discriminatory-purpose requirement. *Wright* v. *Rockefeller, supra,* was a racial gerrymander case, and the plaintiffs had alleged only that they were the victims of an intentional scheme to draw districting lines discriminatorily. In focusing solely on whether the plaintiffs had proved intentional discrimination, the Court in *Wright* v. *Rockefeller* was merely limiting the scope of its inquiry to the issue raised by the plaintiffs. If *Wright* v. *Rockefeller* had been brought after this Court had decided our vote-dilution decisions, the plaintiffs perhaps would have recognized that, in addition to a claim of intentional racial gerrymandering, they could allege an equally sufficient cause of action under the Equal Protection Clause—that the districting lines had the effect of diluting their vote.

*Wright* v. *Rockefeller*, then, treated proof of discriminatory purpose as a sufficient condition to trigger strict scrutiny of a districting scheme, but had no occasion to consider whether such proof was necessary to invoke that standard. Its citations in *Washington* v. *Davis, supra,* and *Arlington*

## II

Section 1 of the Fifteenth Amendment provides:

"The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

Today the plurality gives short shrift to the argument that proof of discriminatory intent is not a necessary condition to relief under this Amendment. See *ante,* at 61–65.[24] I have examined this issue in another context and reached the contrary result. *Beer* v. *United States,* 425 U. S. 130, 146–149, and nn. 3–5 (1976) (dissenting opinion). I continue to be-

---

*Heights, supra,* were useful to show the relevancy, but not the necessity, of evidence of discriminatory intent. These citations are in no way inconsistent with my view that proof of discriminatory purpose is not a necessary condition to the invalidation of multimember districts that dilute the vote of racial or political elements.

In addition, any argument that, merely by citing *Wright* v. *Rockefeller,* the Court in *Washington* v. *Davis* and *Arlington Heights* intended to apply the discriminatory-intent requirement to vote-dilution claims is premised on two unpalatable assumptions. First, because the discussion of *Wright* v. *Rockefeller* was unnecessary to the resolution of the issues in both of those decisions, the argument assumes that the Court in both cases decided important issues in brief dicta. Second, the argument assumes that the Court twice intended covertly to overrule the discriminatory-effects test applied in *White* v. *Regester,* 412 U. S. 755 (1973), without even citing *White.* Neither assumption is tenable.

[24] It is important to recognize that only the four Members of the plurality are committed to this view. In addition to my Brother BRENNAN and myself, my Brother STEVENS expressly states that proof of discriminatory effect can be a sufficient condition to support the invalidation of districting, see *ante,* at 90. My Brother WHITE finds the proof of discriminatory purpose in these cases sufficient to support the decisions of the Courts of Appeals, and accordingly he does not reach the issue whether proof of discriminatory impact, standing alone, would suffice under the Fifteenth Amendment. My Brother BLACKMUN also expresses no view on this issue, since he too finds the proof of discriminatory intent sufficient to support the findings of violations of the Constitution.

lieve that "a showing of purpose or of effect is alone sufficient to demonstrate unconstitutionality," *id.*, at 149, n. 5, and wish to explicate further why I find this standard appropriate for Fifteenth Amendment claims. First, however, it is necessary to address the plurality's apparent suggestion that the Fifteenth Amendment protects against only denial, and not dilution, of the vote.[25]

## A

The Fifteenth Amendment does not confer an absolute right to vote. See *ante,* at 62. By providing that the right to vote cannot be discriminatorily "denied *or* abridged," however, the Amendment assuredly strikes down the diminution as well as the outright denial of the exercise of the franchise. An interpretation holding that the Amendment reaches only complete abrogation of the vote would render the Amendment essentially useless, since it is no difficult task to imagine schemes in which the Negro's marking of the ballot is a meaningless exercise.

The Court has long understood that the right to vote encompasses protection against vote dilution. "[T]he right to have one's vote counted" is of the same importance as "the right to put a ballot in a box." *United States* v. *Mosley,* 238 U. S. 383, 386 (1915). See *United States* v. *Classic,* 313 U. S. 299 (1941); *Swafford* v. *Templeton,* 185 U. S. 487 (1902); *Wiley* v. *Sinkler,* 179 U. S. 58 (1900); *Ex parte Yarbrough,* 110 U. S. 651 (1884). The right to vote is protected against the diluting effect of ballot-box stuffing. *United States* v. *Saylor,* 322 U. S. 385 (1944); *Ex parte Siebold,* 100 U. S. 371 (1880). Indeed, this Court has explicitly recognized that the Fifteenth Amendment protects against vote dilution. In *Terry* v. *Adams,* 345 U. S. 461 (1953), and *Smith* v. *Allwright,* 321 U. S.

---

[25] The plurality states that "[h]aving found that Negroes in Mobile 'register and vote without hindrance,' the District Court and Court of Appeals were in error in believing that the appellants invaded the protection of that Amendment in the present case." *Ante,* at 65.

649 (1944), the Negro plaintiffs did not question their access to the ballot for general elections. Instead they argued, and the Court recognized, that the value of their votes had been diluted by their exclusion from participation in primary elections and in the slating of candidates by political parties. The Court's struggles with the concept of "state action" in those decisions were necessarily premised on the understanding that vote dilution was a claim cognizable under the Fifteenth Amendment.

*Wright* v. *Rockefeller,* 376 U. S. 52 (1964), recognized that an allegation of vote dilution resulting from the drawing of district lines stated a claim under the Fifteenth Amendment. The plaintiffs in that case argued that congressional districting in New York violated the Fifteenth Amendment because district lines had been drawn in a racially discriminatory fashion. Each plaintiff had access to the ballot; their complaint was that because of intentional discrimination they resided in a district with population characteristics that had the effect of diluting the weight of their votes. The Court treated this claim as cognizable under the Fifteenth Amendment. More recently, in *United Jewish Organizations* v. *Carey,* 430 U. S. 144 (1977), we again treated an allegation of vote dilution arising from a redistricting scheme as stating a claim under the Fifteenth Amendment. See *id.,* at 155, 161–162, 165–168 (opinion of WHITE, J.). Indeed, in that case MR. JUSTICE STEWART found no Fifteenth Amendment violation in part because the plaintiffs had failed to prove "that the redistricting scheme was employed . . . to minimize or cancel out the voting strength of a minority class or interest; or otherwise to impair or burden the opportunity of affected persons to participate in the political process." *Id.,* at 179 (STEWART, J., joined by POWELL, J., concurring in judgment) (citing, *e. g., White* v. *Regester,* 412 U. S. 755 (1973); *Fortson* v. *Dorsey,* 379 U. S. 433 (1965); *Wright* v. *Rockefeller, supra*). See also *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960).

It is plain, then, that the Fifteenth Amendment shares the concept of vote dilution developed in such Fourteenth Amendment decisions as *Reynolds* v. *Sims,* 377 U. S. 533 (1964), and *Fortson* v. *Dorsey, supra.* In fact, under the Court's unified view of the protections of the right to vote accorded by disparate portions of the Constitution, the concept of vote dilution is a core principle of the Seventeenth and Nineteenth Amendments as well as the Fourteenth and Fifteenth:

> "The Fifteenth Amendment prohibits a State from denying or abridging a Negro's right to vote. The Nineteenth Amendment does the same for women. If a State in a statewide election weighted the male vote more heavily than the female vote or the white vote more heavily than the Negro vote, none could successfully contend that that discrimination was allowable. See *Terry* v. *Adams,* 345 U. S. 461. . . . Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment.
>
> .        .        .        .        .
>
> "The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote." *Gray* v. *Sanders,* 372 U. S., at 379, 381.

The plurality's suggestion that the Fifteenth Amendment reaches only outright denial of the ballot is wholly inconsistent not only with our prior decisions, but also with the gloss the plurality would place upon the Fourteenth Amendment's protection against vote dilution. As I explained in Part I, *supra,* I strongly disagree with the plurality's conclusion that our

Fourteenth Amendment vote-dilution decisions have been based upon the Equal Protection Clause's prohibition of racial discrimination. Be that as it may, the plurality at least does not dispute that the Fourteenth Amendment's language—that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws"—protects against dilution, as well as outright denial, of the right to vote on racial grounds, even though the Amendment does not mention any right to vote and speaks only of the denial, and not the diminution, of rights. Yet, when the plurality construes the language of the Fifteenth Amendment—which explicitly acknowledges the right to vote and prohibits its denial *or* abridgment on account of race—it seemingly would accord protection against only the absolute abrogation of the ballot.

An interpretation of the Fifteenth Amendment limiting its prohibitions to the outright denial of the ballot would convert the words of the Amendment into language illusory in symbol and hollow in substance. Surely today's decision should not be read as endorsing that interpretation.[26]

## B

The plurality concludes that our prior decisions establish the principle that proof of discriminatory intent is a necessary element of a Fifteenth Amendment claim.[27] In contrast, I

[26] Indeed, five Members of the Court decline the opportunity to ascribe to this view. In addition to my Brother BRENNAN and myself, my Brother STEVENS expressly states that the Fifteenth Amendment protects against diminution as well as denial of the ballot, see *ante*, at 84, and n. 3. The dissenting opinion of my Brother WHITE and the separate opinion of my Brother BLACKMUN indicate that they share this view.

[27] The plurality does not attempt to support this proposition by relying on the history surrounding the adoption of the Fifteenth Amendment. I agree that we should resolve the issue of the relevancy of proof of discriminatory purpose and effect by examining our prior decisions and by considering the appropriateness of alternative standards in light of contemporary circumstances. That was, of course, the approach used in *Washington* v. *Davis*, 426 U. S. 229 (1976), to evaluate that issue with regard to Fourteenth Amendment racial discrimination claims.

continue to adhere to my conclusion in *Beer* v. *United States,* 425 U. S., at 148, n. 4 (dissenting opinion), that "[t]he Court's decisions relating to the relevance of purpose-and/ or-effect analysis in testing the constitutionality of legislative enactments are somewhat less than a seamless web." As I there explained, at various times the Court's decisions have seemed to adopt three inconsistent approaches: (1) that purpose alone is the test for unconstitutionality; (2) that effect alone is the test; and (3) that purpose or effect, either alone or in combination, is sufficient to show unconstitutionality. *Ibid.* In my view, our Fifteenth Amendment jurisprudence on the necessity of proof of discriminatory purpose is no less unsettled than was our approach to the importance of such proof in Fourteenth Amendment racial discrimination cases prior to *Washington* v. *Davis,* 426 U. S. 229 (1976). What is called for in the present cases is a fresh consideration—similar to our inquiry in *Washington* v. *Davis, supra,* with regard to Fourteenth Amendment discrimination claims— of whether proof of discriminatory purpose is necessary to establish a claim under the Fifteenth Amendment. I will first justify my conclusion that our Fifteenth Amendment precedents do not control the outcome of this issue, and then turn to an examination of how the question should be resolved.

1

The plurality cites *Guinn* v. *United States,* 238 U. S. 347 (1915); *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960); *Wright* v. *Rockefeller,* 376 U. S. 52 (1964); *Lassiter* v. *Northampton Election Bd.,* 360 U. S. 45 (1959); and *Lane* v. *Wilson,* 307 U. S. 268 (1939), as holding that proof of discriminatory purpose is necessary to support a Fifteenth Amendment claim. To me, these decisions indicate confusion, not resolution of this issue. As the plurality suggests, *ante,* at 62, the Court in *Guinn* v. *United States, supra,* did examine the purpose of a "grandfather clause" in the course of invalidating it. Yet 24 years later, in *Lane* v. *Wilson, supra,* at 277, the Court

struck down a more sophisticated exclusionary scheme because it "operated unfairly" against Negroes. In accord with the prevailing doctrine of the time, see *Arizona* v. *California,* 283 U. S. 423, 455, and n. 7 (1931), the Court in *Lane* seemingly did not question the motives of public officials.

In upholding the use of a literacy test for voters in *Lassiter* v. *Northampton Election Bd., supra,* the Court apparently concluded that the plaintiff had failed to prove either discriminatory purpose or effect. *Gomillion* v. *Lightfoot, supra,* can be read as turning on proof of discriminatory motive, but the Court also stressed that the challenged redrawing of municipal boundaries had the "essential inevitable effect" of removing Negro voters from the city, 364 U. S., at 341, and that "the inescapable human effect of this essay in geometry and geography is to despoil colored citizens, and only colored citizens, of their theretofore enjoyed voting rights," *id.,* at 347. Finally, in *Wright* v. *Rockefeller, supra,* the plaintiffs alleged only purposeful discriminatory redistricting, and therefore the Court had no reason to consider whether proof of discriminatory effect would satisfy the Fifteenth Amendment.[28]

The plurality ignores cases suggesting that discriminatory purpose is not necessary to support a Fifteenth Amendment claim. In *Terry* v. *Adams,* 345 U. S. 461 (1953), a case in which no majority opinion was issued, three Justices approvingly discussed two decisions of the United States Court of Appeals for the Fourth Circuit[29] holding "that no election machinery could be sustained if its purpose *or* effect was to deny Negroes on account of their race an effective voice in the governmental affairs of their country, state, or community." *Id.,* at 466 (opinion of Black, J., joined by Douglas and Burton, JJ.) (emphasis added). More recently, in rejecting a First Amendment challenge to a federal statute provid-

---

[28] See n. 23, *supra.*

[29] *Rice* v. *Elmore,* 165 F. 2d 387 (1947), cert. denied, 333 U. S. 875 (1948), and *Baskin* v. *Brown,* 174 F. 2d 391 (1949).

ing criminal penalties for knowing destruction of a Selective Service registration certificate, the Court in *United States* v. *O'Brien*, 391 U. S. 367, 383 (1968), stated that "[i]t is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." The Court in *O'Brien, supra,* at 385, interpreted *Gomillion* v. *Lightfoot, supra,* as turning on the discriminatory effect, and not the alleged discriminatory purpose, of the challenged redrawing of municipal boundaries. Three years later, in *Palmer* v. *Thompson,* 403 U. S. 217, 224–225 (1971), the Court relied on *O'Brien* to support its refusal to inquire whether a city had closed its swimming pools to avoid racial integration. As in *O'Brien,* the Court in *Palmer, supra,* at 225, interpreted *Gomillion* v. *Lightfoot* as focusing "on the actual effect" of the municipal boundary change, and not upon what motivated the city to redraw its borders. See also *Wright* v. *Council of City of Emporia,* 407 U. S. 451, 461–462 (1972).

In holding that racial discrimination claims under the Equal Protection Clause must be supported by proof of discriminatory intent, the Court in *Washington* v. *Davis, supra,* signaled some movement away from the doctrine that such proof is irrelevant to constitutional adjudication. Although the Court, 426 U. S., at 242–244, and n. 11, attempted mightily to distinguish *Palmer* v. *Thompson, supra,* its decision was in fact based upon a judgment that, in light of modern circumstances, the Equal Protection Clause's ban on racial discrimination in the distribution of constitutional gratuities should be interpreted as prohibiting only intentional official discrimination.[30]

These vacillations in our approach to the relevance of discriminatory purpose belie the plurality's determination that our prior decisions require such proof to support Fifteenth Amendment claims. To the contrary, the Court today is in

---

[30] See nn. 20, 21, *supra,* and accompanying text.

the same unsettled position with regard to the Fifteenth Amendment as it was four years ago in *Washington* v. *Davis, supra,* regarding the Fourteenth Amendment's prohibition of racial discrimination. The absence of old answers mandates a new inquiry.

2

The Court in *Washington* v. *Davis* required a showing of discriminatory purpose to support racial discrimination claims largely because it feared that a standard based solely on disproportionate impact would unduly interfere with the far-ranging governmental distribution of constitutional gratuities.[31] Underlying the Court's decision was a determination that, since the Constitution does not entitle any person to such governmental benefits, courts should accord discretion to those officials who decide how the government shall allocate its scarce resources. If the plaintiff proved only that governmental distribution of constitutional gratuities had a disproportionate effect on a racial minority, the Court was willing to presume that the officials who approved the allocation scheme either had made an honest error or had foreseen that the decision would have a discriminatory impact and had found persuasive, legitimate reasons for imposing it nonetheless. These assumptions about the good faith of officials allowed the Court to conclude that, standing alone, a showing that a governmental policy had a racially discriminatory impact did not indicate that the affected minority had suffered the stigma, frustration, and unjust treatment prohibited

---

[31] The Court stated:

"A rule that a statute designed to serve neutral ends is nevertheless invalid, absent compelling justification, if in practice it benefits or burdens one race more than another would be far reaching and would raise serious questions about, and perhaps invalidate, a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more burdensome to the poor and to the average black than to the more affluent white." 426 U. S., at 248.

See n. 20, *supra.*

under the suspect-classification branch of our equal protection jurisprudence.

Such judicial deference to official decisionmaking has no place under the Fifteenth Amendment. Section 1 of that Amendment differs from the Fourteenth Amendment's prohibition on racial discrimination in two crucial respects: it explicitly recognizes the right to vote free of hindrances related to race, and it sweeps no further. In my view, these distinctions justify the conclusion that proof of racially discriminatory impact should be sufficient to support a claim under the Fifteenth Amendment. The right to vote is of such fundamental importance in the constitutional scheme that the Fifteenth Amendment's command that it shall not be "abridged" on account of race must be interpreted as providing that the votes of citizens of all races shall be of substantially equal weight. Furthermore, a disproportionate-impact test under the Fifteenth Amendment would not lead to constant judicial intrusion into the process of official decisionmaking. Rather, the standard would reach only those decisions having a discriminatory effect upon the minority's vote. The Fifteenth Amendment cannot tolerate that kind of decision, even if made in good faith, because the Amendment grants racial minorities the full enjoyment of the right to vote, not simply protection against the unfairness of intentional vote dilution along racial lines.[32]

In addition, it is beyond dispute that a standard based solely upon the motives of official decisionmakers creates significant problems of proof for plaintiffs and forces the inquiring court to undertake an unguided, tortuous look into the minds of officials in the hope of guessing why certain policies were adopted and others rejected. See *Palmer* v. *Thomp-*

---

[32] Even if a municipal policy is shown to dilute the right to vote, however, the policy will not be struck down if the city shows that it serves highly important local interests and is closely tailored to effectuate only those interests. See *Dunn* v. *Blumstein,* 405 U. S. 330 (1972). Cf. *Abate* v. *Mundt,* 403 U. S. 182 (1971).

*son,* 403 U. S., at 224–225; *United States* v. *O'Brien,* 391 U. S., at 382–386; cf. *Keyes* v. *School District No. 1, Denver, Colo.,* 413 U. S. 189, 224, 227 (1973) (POWELL, J., concurring in part and dissenting in part). An approach based on motivation creates the risk that officials will be able to adopt policies that are the products of discriminatory intent so long as they sufficiently mask their motives through the use of subtlety and illusion. *Washington* v. *Davis* is premised on the notion that this risk is insufficient to overcome the deference the judiciary must accord to governmental decisions about the distribution of constitutional gratuities. That risk becomes intolerable, however, when the precious right to vote protected by the Fifteenth Amendment is concerned.

I continue to believe, then, that under the Fifteenth Amendment an "[e]valuation of the purpose of a legislative enactment is just too ambiguous a task to be the sole tool of constitutional analysis. . . . [A] demonstration of effect ordinarily should suffice. If, of course, purpose may conclusively be shown, it too should be sufficient to demonstrate a statute's unconstitutionality." *Beer* v. *United States,* 425 U. S., at 149–150, n. 5 (MARSHALL, J., dissenting). The plurality's refusal in this case even to consider this approach bespeaks an indifference to the plight of minorities who, through no fault of their own, have suffered diminution of the right preservative of all other rights.[33]

---

[33] In my view, the standard of *White* v. *Regester,* 412 U. S. 755 (1973), see n. 7, *supra,* and accompanying text, is the proper test under both the Fourteenth and Fifteenth Amendments for determining whether a districting scheme has the unconstitutional effect of diluting the Negro vote. It is plain that the District Court in both of the cases before us made the "intensely local appraisal" necessary under *White, supra,* at 769, and correctly decided that the at-large electoral schemes for the Mobile City Commission and County School Board violated the *White* standard. As I earlier note with respect to No. 77–1844, see *supra,* at 122–123, the District Court determined: (1) that Mobile Negroes still suffered pervasive present effects of massive historical official and private discrimination; (2) that the City Commission and County School Board had been quite

136

## III

If it is assumed that proof of discriminatory intent is necessary to support the vote-dilution claims in these cases, the question becomes what evidence will satisfy this requirement.[34]

The plurality assumes, without any analysis, that these cases are appropriate for the application of the rigid test developed in *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S., at 279, requiring that "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." In my view, the *Feeney* standard creates a burden of proof far too extreme to apply in vote-dilution cases.[35]

---

unresponsive to the needs of the minority community; (3) that no Negro had ever been elected to either body, despite the fact that Negroes constitute about one-third of the electorate; (4) that the persistence of severe racial bloc voting made it highly unlikely that any Negro could be elected at large to either body in the foreseeable future; and (5) that no state policy favored at-large elections, and the local preference for that scheme was outweighed by the fact that the unconstitutional vote dilution could be corrected only by the imposition of single-member districts. *Bolden* v. *City of Mobile,* 423 F. Supp. 384 (SD Ala. 1976); *Brown* v. *Moore,* 428 F. Supp. 1123 (SD Ala. 1976). The Court of Appeals affirmed these findings in all respects. *Bolden* v. *City of Mobile,* 571 F. 2d 238 (CA5 1978); *Brown* v. *Moore,* 575 F. 2d 298 (CA5 1978). See also the dissenting opinion of my Brother WHITE, *ante,* p. 94.

[34] The statutes providing for at-large election of the members of the two governmental bodies involved in these cases, see n. 33, *supra,* have been in effect since the days when Mobile Negroes were totally disenfranchised by the Alabama Constitution of 1901. The District Court in both cases found, therefore, that the at-large schemes could not have been adopted for discriminatory purposes. *Bolden* v. *City of Mobile,* 423 F. Supp., at 386, 397; *Brown* v. *Moore,* 428 F. Supp., at 1126–1127, 1138. The issue is, then, whether officials have maintained these electoral systems for discriminatory purposes. Cf. *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S., at 257–258, 267–271, and n. 17.

[35] As the dissenting opinion of my Brother WHITE demonstrates, however, the facts of these cases compel a finding of unconstitutional vote dilution even under the plurality's standard.

This Court has acknowledged that the evidentiary inquiry involving discriminatory intent must necessarily vary depending upon the factual context. See *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S., at 264–268; *Washington* v. *Davis*, 426 U. S., at 253 (STEVENS, J., concurring). One useful evidentiary tool, long recognized by the common law, is the presumption that "[e]very man must be taken to contemplate the probable consequences of the act he does." *Townsend* v. *Wathen*, 9 East. 277, 280, 103 Eng. Rep. 579, 580–581 (K. B. 1808). The Court in *Feeney, supra,* at 279, n. 25, acknowledged that proof of foreseeability of discriminatory consequences could raise a "strong inference that the adverse effects were desired," but refused to treat this presumption as conclusive in cases alleging discriminatory distribution of constitutional gratuities.

I would apply the common-law foreseeability presumption to the present cases. The plaintiffs surely proved that maintenance of the challenged multimember districting would have the foreseeable effect of perpetuating the submerged electoral influence of Negroes, and that this discriminatory effect could be corrected by implementation of a single-member districting plan.[36] Because the foreseeable disproportionate impact was so severe, the burden of proof should have shifted to the defendants, and they should have been required to show that they refused to modify the districting schemes in spite of, not because of, their severe discriminatory effect. See *Feeney, supra,* at 284 (MARSHALL, J., dissenting). Reallocation of the burden of proof is especially appropriate in these cases, where the challenged state action infringes the exercise of a fundamental right. The defendants would carry their burden of proof only if they showed that they considered submergence

---

[36] Indeed, the District Court in the present cases concluded that the evidence supported the plaintiffs' position that unconstitutional vote dilution was the natural and foreseeable consequence of the maintenance of the challenged multimember districting. *Brown* v. *Moore*, 428 F. Supp., at 1138; *Bolden* v. *City of Mobile*, 423 F. Supp., at 397–398.

of the Negro vote a detriment, not a benefit, of the multi-member systems, that they accorded minority citizens the same respect given to whites, and that they nevertheless decided to maintain the systems for legitimate reasons. Cf. *Mt. Healthy City Board of Ed.* v. *Doyle,* 429 U. S. 274, 287 (1977); *Arlington Heights* v. *Metropolitan Housing Dev. Corp., supra,* at 270–271, n. 21.

This approach recognizes that

> "[f]requently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation." *Washington* v. *Davis, supra,* at 253 (STEVENS, J., concurring).

Furthermore, if proof of discriminatory purpose is to be required in these cases, this standard would comport with my view that the degree to which the government must justify a decision depends upon the importance of the interests infringed by it. See *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S., at 109–110 (MARSHALL, J., dissenting).[37]

---

[37] MR. JUSTICE STEVENS acknowledges that both discriminatory intent and discriminatory effect are present in No. 77–1844. See *ante,* at 92–94. Nonetheless, he finds no constitutional violation, apparently because he believes that the electoral structure of Mobile conforms to a commonly used scheme, the discriminatory impact is in his view not extraordinary, and the structure is supported by sufficient noninvidious justifications so that it is neither wholly irrational nor entirely motivated by discriminatory animus. To him, racially motivated decisions in this setting are an inherent part of the political process and do not involve invidious discrimination.

The facts of the present cases, however, indicate that in Mobile considerations of race are far more powerful and pernicious than are considerations of other divisive aspects of the electorate. See *supra,* at 122–123. In Mobile, as elsewhere, "the experience of Negroes . . . has been different

The plurality also fails to recognize that the maintenance of multimember districts in the face of foreseeable discriminatory consequences strongly suggests that officials are blinded by "racially selective sympathy and indifference."[38] Like outright racial hostility, selective racial indifference reflects a belief that the concerns of the minority are not worthy of the same degree of attention paid to problems perceived by whites. When an interest as fundamental as voting is diminished along racial lines, a requirement that discriminatory purpose must be proved should be satisfied by a showing that official action was produced by this type of pervasive bias. In the present cases, the plaintiffs presented strong evidence of such bias: they showed that Mobile officials historically discriminated against Negroes, that there are pervasive present effects of this past discrimination, and that officials have not been responsive to the needs of the minority community. It takes only the smallest of inferential leaps to conclude that the decisions to maintain multimember districting having obvious discriminatory effects represent, at the very least, selective racial sympathy and indifference resulting in the frustration of minority desires, the stigmatization of the minority as second-class citizens, and the perpetuation of inhumanity.[39]

---

in kind, not just in degree, from that of other ethnic groups." *University of California Regents* v. *Bakke*, 438 U. S. 265, 400 (1978) (opinion of MARSHALL, J.). An approach that accepts intentional discrimination against Negroes as merely an aspect of "politics as usual" strikes at the very hearts of the Fourteenth and Fifteenth Amendments.

[38] Brest, The Supreme Court, 1975 Term—Foreword: In Defense of the Antidiscrimination Principle, 90 Harv. L. Rev. 1, 7 (1976). See also Note, Racial Vote Dilution in Multimember Districts: The Constitutional Standard After *Washington* v. *Davis*, 76 Mich. L. Rev. 694, 716–719 (1978).

[39] The plurality, *ante*, at 74–75, n. 21, indicates that on remand the lower courts are to examine the evidence in these cases under the discriminatory-intent standard of *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256 (1979), and may conclude that this test is met by proof of the refusal of Mobile's state-legislative delegation to stimulate the passage

## IV

The American approach to government is premised on the theory that, when citizens have the unfettered right to vote,

of legislation changing Mobile's city government into a mayor-council system in which council members are elected from single-member districts. The plurality concludes, then, only that the District Court and the Court of Appeals in each of the present cases evaluated the evidence under an improper legal standard, and not that the evidence fails to support a claim under *Feeney, supra.* When the lower courts examine these cases under the *Feeney* standard, they should, of course, recognize the relevancy of the plaintiffs' evidence that vote dilution was a foreseeable and natural consequence of the maintenance of the challenged multimember districting, and that officials have apparently exhibited selective racial sympathy and indifference. Cf. *Dayton Board of Education* v. *Brinkman,* 443 U. S. 526 (1979); *Columbus Board of Education* v. *Penick,* 443 U. S. 449 (1979).

Finally, it is important not to confuse the differing views the plurality and I have on the elements of proving unconstitutional vote dilution. The plurality concludes that proof of intentional discrimination, as defined in *Feeney, supra,* is necessary to support such a claim. The plurality finds this requirement consistent with the statement in *White* v. *Regester,* 412 U. S., at 766, that unconstitutional vote dilution does not occur simply because a minority has not been able to elect representatives in proportion to its voting potential. The extra necessary element, according to the plurality, is a showing of discriminatory intent. In the plurality's view, the evidence presented in *White* going beyond mere proof of underrepresentation of the minority properly supported an inference that the multimember districting scheme in question was tainted with a discriminatory purpose.

The plurality's approach should be satisfied, then, by proof that an electoral scheme enacted with a discriminatory purpose effected a retrogression in the minority's voting power. Cf. *Beer* v. *United States,* 425 U. S. 130, 141 (1976). The standard should also be satisfied by proof that a scheme maintained for a discriminatory purpose has the effect of submerging minority electoral influence below the level it would have under a reasonable alternative scheme.

The plurality does not address the question whether proof of discriminatory effect is necessary to support a vote-dilution claim. It is clear from the above, however, that if the Court at some point creates such a requirement, it would be satisfied by proof of mere disproportionate impact. Such a requirement would be far less stringent than the burden of proof re-

public officials will make decisions by the democratic accommodation of competing beliefs, not by deference to the mandates of the powerful. The American approach to civil rights is premised on the complementary theory that the unfettered right to vote is preservative of all other rights. The theoretical foundations for these approaches are shattered where, as in the present cases, the right to vote is granted in form, but denied in substance.

It is time to realize that manipulating doctrines and drawing improper distinctions under the Fourteenth and Fifteenth Amendments, as well as under Congress' remedial legislation enforcing those Amendments, make this Court an accessory to the perpetuation of racial discrimination. The plurality's requirement of proof of *intentional discrimination,* so inappropriate in today's cases, may represent an attempt to bury the legitimate concerns of the minority beneath the soil of a doctrine almost as impermeable as it is specious. If so, the superficial tranquility created by such measures can be but short-lived. If this Court refuses to honor our long-recognized principle that the Constitution "nullifies sophisticated as well as simple-minded modes of discrimination," *Lane* v. *Wilson,* 307 U. S., at 275, it cannot expect the victims of discrimination to respect political channels of seeking redress. I dissent.

---

quired under the rather rigid discriminatory-effects test I find in *White* v. *Regester, supra.* See n. 7, *supra,* and accompanying text.